# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MAURICIO COREAS and
ANGEL GUZMAN CEDILLO,

     Petitioners,

     v.

DONNA BOUNDS,
*in her official capacity as Warden,*
*Worcester County Detention Center,*
JACK KAVANAUGH,
*in his official capacity as Director,*
*Howard County Detention Center,*
JANEAN OHIN,
*in her official capacity as*
*Acting Baltimore Field Office Director,*
*U.S. Immigration and Customs Enforcement,*
MATTHEW T. ALBENCE,
*in his official capacity as Deputy Director*
*and Senior Official performing the duties of*
*the Director of the U.S. Immigration*
*and Customs Enforcement,*
and
IMMIGRATION AND CUSTOMS
ENFORCEMENT,

     Respondents.

Civil Action No. TDC-20-0780

## MEMORANDUM OPINION

Petitioners Mauricio Coreas and Angel Guzman Cedillo ("Guzman Cedillo"), currently in

immigration detention, have filed this action pursuant to 28 U.S.C. § 2241 against Respondents

Donna Bounds, Warden of the Worcester County Detention Center in Snow Hill, Maryland; Jack

Kavanaugh, Director of the Howard County Detention Center in Jessup, Maryland; Janean Ohin,

the Acting Baltimore Field Office Director for United States Immigration and Customs

Enforcement ("ICE"); Matthew T. Albence, Deputy Director and Senior Official performing the duties of the Director of ICE; and ICE. Pending before the Court is Petitioners' Motion for a Temporary Restraining Order ("TRO"), seeking their immediate release in response to the COVID-19 pandemic. The Motion is fully briefed, and the Court held a video hearing on the Motion on April 2, 2020. For the reasons set forth below, the Motion will be DENIED WITHOUT PREJUDICE.

## BACKGROUND

### I. The COVID-19 Pandemic

The virus identified as SARS-CoV-2, commonly referred to as the novel coronavirus ("the Coronavirus"), has caused a global pandemic of the condition known as COVID-19. As of April 3, 2020, there were 932,166 confirmed cases and 46,764 deaths worldwide. *Coronavirus Disease (COVID-19) Pandemic*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019. As of April 2, 2020, there were 213,144 confirmed cases and 4,513 deaths in the United States. *Cases in U.S.*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. The Centers for Disease Control and Prevention ("CDC") has projected that, without effective public health intervention, about 200 million people in the United States may contract the disease, and, under some projections, as many as 1.5 million people in the United States may die from the disease. Another organization's projection puts the potential number of American fatalities at 2.2 million. Moreover, some evidence suggests that, even when not fatal, COVID-19 results in long-term, serious illnesses, which may include severe damage to internal organs, in about 16 percent of cases.

COVID-19 poses special risks for the elderly and those with certain preexisting medical conditions. *Amici Curiae* Public Health and Human Rights Experts Br. at 6-7, ECF No. 32. The

CDC has identified several medical conditions that place an individual at an increased risk of serious COVID-19 complications: "blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological[,] neurologic and neurodevelopmental conditions, and current or recent pregnancy." Greifinger Decl. ¶ 7, Reply Mot. TRO ("Reply") Ex. 6, ECF No. 52-6. Of those who have died from COVID-19 in Italy, another country experiencing a high number of COVID-19 cases, about three-fourths had high blood pressure, one-third had diabetes, and one-third had heart disease. According to Dr. Jonathan Louis Golob, an Assistant Professor at the University of Michigan School of Medicine, there is evidence that in the highest risk populations, COVID-19 causes death in about 15 percent of cases. Preliminary data from China has shown that 20 percent of COVID-19 cases involving high-risk categories have resulted in death.

There is no vaccine, antiviral treatment, or cure for COVID-19. The Coronavirus is believed to spread through "droplets" that can be transmitted during close interpersonal contact, though these droplets can also survive on surfaces for days and spread the disease even absent such close contact. *Id.* ¶ 21. There is some evidence that individuals with the Coronavirus can transmit it to others even when they are not yet symptomatic. Public health measures aiming to stop the spread of the virus—most notably the practice of social distancing—have been widespread: "[s]chools, courts, collegiate and professional sports, theater and other congregate settings have been closed," *id.* ¶ 8, and many states have issued mandatory social distancing polices. The Governor of Maryland issued a stay-at-home order on March 30, 2020. *See* Order of the Governor of the State of Maryland § II, No. 20-03-30-01 (Mar. 30, 2020), https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf. As of April 2, 2020, 40 states and the District of Columbia had issued stay-at-home or shelter-in-place orders. *See These*

*States Have Implemented Stay-at-Home Orders*, CNN (Apr. 2, 2020), https://www.cnn.com/2020/03/23/us/coronavirus-which-states-stay-at-home-order-trnd/index.html.

Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19. First, even if these facilities suspend in-person visitation, the staff, contractors, and vendors working at the facilities can still introduce the Coronavirus into the facility, a risk that is all the more difficult to contain because asymptomatic individuals can transmit the virus and because these facilities lack the capacity to screen for the virus in asymptomatic individuals. According to Petitioners' expert, Dr. Robert B. Greifinger, an expert on prison and jail health care and the former manager of medical care for the New York State prison system, "[j]ails and detention centers are congregate environments where the risk of infection and infectious spread are extraordinarily high." Greifinger Decl. ¶¶ 1-2, 16. Indeed, there have already been confirmed outbreaks of COVID-19 at several prisons and detention facilities across the United States, including the Rikers Island detention facility in New York City, the Cook County Jail in Chicago, Illinois, and the federal prison in Oakdale, Louisiana, as well as certain New Jersey jails housing ICE detainees. In this region, COVID-19 has been identified in the Clifton T. Perkins Hospital Center, a psychiatric hospital in Jessup, Maryland; and the D.C. Jail in Washington, D.C.

Second, once the Coronavirus is introduced into a detention facility, the nature of these facilities makes the mitigation measures introduced elsewhere in the country difficult or impossible to implement. Detention facilities often lack personal protective equipment that helps prevent the transmission of the virus. Shared facilities, such as bathrooms, dining halls, and telephones, are often not disinfected between uses. Poor ventilation increases the risk of transmission. Detained individuals are often not given the opportunity or tools to wash or sanitize

their hands frequently.  And the crowded nature of the facilities can make social distancing recommended by the CDC impossible.

The ICE Health Service Corps, which oversees medical care at ICE detention facilities, has issued new guidelines for addressing the COVID-19 pandemic.  *See Interim Reference Sheet on 2019-Novel Coronavirus (COVID-19)*, ICE Health Service Corps, Mar. 6, 2020, https://www.aila.org/infonet/ice-interim-reference-sheet-coronavirus.  The guidelines set out screening procedures that include questioning incoming detainees about travel and potential contact with individuals with COVID-19 and establish some protocols for isolating and monitoring detainees with COVID-19.  However, the guidelines do not advise on how and when to test individuals for COVID-19 or to plan for surges once the illness spreads.  They also do not include guidance on how to identify detainees at high risk due to health conditions or how to provide special protection for high-risk detainees.

Some courts have granted motions to release high-risk individuals from ICE detention on constitutional grounds.  For example, in New York, a federal judge ordered that ten detainees who face a high risk of complications from COVID-19 be released from New Jersey immigration detention facilities in which the Coronavirus was confirmed to be present.  *See Basank v. Decker*, 20-cv-2518, 2020 WL 1481503, at *7 (S.D.N.Y. Mar. 26, 2020).  Several other federal courts have also ordered ICE detainees released on the grounds that their continued detention under the threat of the Coronavirus violates the Constitution.  *See, e.g.*, *Thakker v. Doll*, 20-cv-00480, Doc. No. 47 (E.D. Pa. Mar. 31, 2020); *Castillo v. Barr*, No. 20-cv-0605, 2020 WL 1502864, at *6 (C.D. Cal. Mar. 27, 2020); *Coronel v. Decker*, No. 20-cv-2472, 2020 WL 1487274, at *10 (S.D.N.Y. Mar. 27, 2020).  Other courts have declined to release immigration detainees on this basis.  *See Sacal-*

*Micha v. Longoria*, No. 20-cv-0037, 2020 WL 1518861, at *6 (S.D. Tex. Mar. 27, 2020); *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1304557, at *1 (W.D. Wash. Mar. 19, 2020).

## II.     Detention of Petitioners

Petitioners are both detained by ICE in Maryland, and both have underlying medical conditions that place them at increased risk of serious complications or even death from COVID-19. According to Dr. Greifinger, based on reviewing the conditions in their respective facilities, "ICE has failed to adequately comprehend and respond to the COVID-19 pandemic for those detained in ICE custody, including at Worcester and Howard County Detention Centers." Greifinger Decl. ¶ 17.

### A.     Mauricio Coreas

Petitioner Mauricio Coreas, a native of El Salvador, is a construction worker who has three daughters in the United States, including one who is a lawful permanent resident as a result of a successful asylum application. Coreas is seeking relief from deportation on asylum grounds and is currently detained by ICE at the Howard County Detention Center ("HCDC"). He is 52 years old and suffers from severe Type 2 diabetes. This medical condition puts him "at high risk for complications from COVID-19 should [he] be exposed to the virus in detention." *Id.* ¶ 31. Coreas was convicted in 2007 in Virginia state court of burglary, arson, and related crimes, deported after serving his sentence, then convicted in 2016 in this Court of illegal reentry after deportation, 8 U.S.C. § 1326 (2018). In 2020, Coreas was convicted of a violation of supervised release on his illegal reentry conviction and sentenced to time served of approximately seven months of imprisonment. He was taken into ICE custody on January 15, 2020 following completion of that sentence. He is scheduled to have an immigration hearing on April 16, 2020.

At HCDC, low security level detainees are housed in dormitories, large rooms with 32 beds, while higher-level detainees are housed in cells that they share with other detainees. Detainees spend approximately 11 hours per day in communal spaces in which they are placed into close contact with other detainees. As of the filing of this case, these communal spaces, which include dining and restroom facilities, were not disinfected regularly. Detainees come into contact with detainees from other dormitories and parts of HCDC in shared spaces such as the chapel, law library, and medical unit, and with detention staff who regularly move to and from different parts of the facility and in and out of the facility. The medical unit and commissary are shared with individuals who are under pretrial detention in criminal cases. Coreas must visit the shared medical unit twice a day to have his blood sugar level checked. As of March 27, 2020, HCDC had space for approximately 100 immigration detainees and was housing 60 such detainees.

Since March 13, 2020, all programs within HCDC, such as chapel services and group presentations, have been suspended. However, according to Petitioners, certain group activities, such as bible study and recreational games, are ongoing at HCDC. Beginning on March 26, 2020, two days after this lawsuit was initiated, HCDC suspended all visits except for attorney visits through non-contact visiting booths; has begun to take the temperature of everyone entering the facility and is denying access to those with temperatures above 100.4 degrees; has issued cleaning kits to allow detainees to clean their cells and bunks; has begun assigning officers to the same housing posts for 14 days to make contact tracking easier; approved emergency staffing plans for each shift; and developed quarantine procedures. Any new detainees were screened for fever, respiratory illness, travel history, and past contact with persons who had contracted COVID-19. HCDC also now provides disinfectant, hand sanitizer, soap, and masks to housing units. However, Coreas has asserted that detainees are given only one bar of soap every two weeks to use for both

bathing and washing their hands; once that soap runs out, detainees must purchase their own soap, if they have the funds to do so. Soap is often unavailable in the bathrooms. Finally, Coreas has stated that the cleaning procedures in the detention facility have not changed since the beginning of the pandemic.

As of March 27, 2020, Respondents report that HCDC had no confirmed and no suspected cases of COVID-19. However, as acknowledged by Respondents during the hearing on the Motion, HCDC has conducted no tests for COVID-19, has no test kits, and has no plans to conduct testing. Meanwhile, Coreas has observed that "[m]any people are coughing and sneezing" at HCDC. Coreas Decl. ¶ 9, Reply Ex. 2, ECF No. 52-2. In fact, Petitioners identify at least three detainees at HCDC who have been exhibiting symptoms consistent with COVID-19 but who have been neither treated nor tested for the Coronavirus. Moreover, Coreas reports that HCDC has not given detainees any information about the Coronavirus, and that they receive their information instead from the news.

**B.      Angel Guzman Cedillo**

Petitioner Angel Guzman Cedillo, a native of Guatemala, is a construction worker with two sons who live in the United States. As he awaits a hearing at which he will seek relief from deportation based on asylum grounds, Guzman Cedillo is detained at Worcester County Detention Center ("WCDC"). He is 54 years old and has hypertension, prostate problems, and a history of traumatic injuries that have limited his cognitive abilities. As with Coreas, these medical conditions put him "at high risk for complications from COVID-19 should [he] be exposed to the virus in detention." Greifinger Decl. ¶ 31. In 2010, Guzman Cedillo was convicted of aggravated assault in Georgia, sentenced to six months of imprisonment, and removed to Guatemala. In 2019, he was convicted in this Court of illegal reentry after deportation and sentenced to time served of

approximately eight months of imprisonment. He was taken into ICE custody after completion of his sentence on November 14, 2019. He is scheduled to have an immigration hearing on April 17, 2020.

WCDC generally houses immigration detainees in shared cells with two detainees per cell. At this time, Guzman Cedillo is not currently sharing a cell. As at HCDC, detainees at WCDC spend about half the day in common areas that are not regularly disinfected, come into contact with each other in several shared spaces, and are frequently moved between units by officers. Immigration detainees use the same recreation area as the criminal pretrial detainees, but at different times. Detainees in criminal custody bring meals to those in immigration detention, and the two sets of detainees share one commissary and one barber shop. WCDC's medical facilities are also used by both sets of detainees. Moreover, those in criminal detention clean the facility's common areas. During a shift, WCDC personnel work either in the immigration detainee or the criminal pretrial detainee unit, except for Medical Unit, Processing Area, and Women's Section staff who interact with both categories of detainees. Over time, however, WCDC personnel may rotate units depending on their shift assignment. As of March 27, 2020, WCDC had capacity for over 200 immigration detainees but was housing only 90 such detainees.

Since the emergence of the COVID-19 pandemic and the filing of this lawsuit, WCDC has taken certain steps to address the threat of the Coronavirus. Since March 20, 2020, there have been no ICE detainees transferred into WCDC. Although there are new criminal pretrial detainees entering WCDC, Respondents report that "[t]he facility screens all newly arriving inmates for potential exposure." Brown Decl. ¶ 25, Opp'n Mot. TRO ("Opp'n") Ex. 1, ECF No. 39-1. In-person visits at WCDC have been stopped, save for visits from attorneys, who are screened before entering the building. WCDC also screens and takes the temperatures of all staff who enter the

facility. WCDC "has extra cleaning practices for the facility and housing units, which includes the installation of soap dispensers and hand air dryers in housing unit dayrooms, a common area within the housing unit." *Id*. ¶ 25. However, the shared showers are not disinfected between uses. Finally, WCDC has identified housing units to be used to quarantine patients who have or are suspected of having COVID-19.

Although Petitioners have alleged that WCDC is under quarantine, Respondents have asserted that such reports related to an ICE administrative facility in Salisbury, Maryland. Rather, Respondents have attested to the fact that as of March 27, 2020, WCDC has had no suspected or confirmed cases of COVID-19. As with HCDC, however, it also has no testing capability and no plans to conduct tests for COVID-19.

**DISCUSSION**

On March 24, 2020, Petitioners filed their Petition for a Writ of Habeas Corpus and a Complaint for Declaratory and Injunctive Relief, along with a Motion for Temporary Restraining Order seeking their release from ICE detention. In the Motion, they assert that they are likely to succeed on the merits of their claim that their ongoing detention violates their due process rights under the Fifth Amendment to the United States Constitution, and that because of their health conditions that make them especially vulnerable to COVID-19, a TRO or preliminary injunction ordering their immediate release is necessary to avoid irreparable harm.

**I.      Standing**

As a threshold issue, Respondents assert that Petitioners lack standing to assert their claims. One "essential aspect" of the limitations that Article III of the Constitution imposes on federal courts is the requirement "that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). "To establish Article III

standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Respondents argue that Petitioners have failed to establish the first and third of these requirements.

### A. Injury-in-Fact

Petitioners do not allege that they have already contracted COVID-19, meaning that the injury they seek to redress is a future one. However, an injury can satisfy Article III's requirements so long as it is "imminent, not conjectural or hypothetical." *Id.* at 158 (citation omitted). Nevertheless, Respondents claim that Petitioners fail to meet this standard because their alleged injury is "conjectural and not imminent," as there are no confirmed cases of COVID-19 in their detention facilities. Opp'n at 8.

The Court disagrees. The imminence requirement is met when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158. Here, Petitioners, who have the burden to establish standing, *id.*, have offered evidence from a medical expert that "detention centers are congregate environments where the risk of infection and infectious spread are extraordinarily high," and that Respondents have failed to implement effective measures to decrease the risk of COVID-19 reaching the facility and Petitioners. Greifinger Decl. ¶ 16. The imminence of the injury facing Petitioners is accentuated by the growing number of COVID-19 cases in detention facilities and the widespread havoc the virus can wreak once inside these facilities. As of April 1, 2020, ICE had reported four cases among its detainees and five cases among personnel working at ICE detention facilities. There have also been three reported cases in Maryland prisons, while there have been hundreds of cases

in prisons and jails outside the state. In these circumstances, the Court has no trouble concluding that the injury Petitioners allege is sufficiently imminent to confer standing.

## B. Redressability

In addition to showing an injury-in-fact, Petitioners "must show that 'it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (quoting *Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000)). "The burden imposed by this requirement is not onerous." *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). "[P]laintiffs need only show that they personally would benefit in a tangible way from the court's intervention." *Id.* (citation omitted).

Respondents argue that Petitioners have not met this low burden because they "do not explain how release from HCDC or WCDC—two facilities without a single confirmed case of COVID-19—into the greater Washington, D.C., area will reduce their risk of injury or death." Opp'n at 9. Even leaving aside the fact that it is impossible to point to any confirmed cases within HCDC or WCDC when Respondents have not conducted any COVID-19 tests at those facilities, this argument strains credulity. Beyond the absurdity of the claim that someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty, Petitioners have provided multiple expert opinions supporting the contrary conclusion, such as that of Dr. Greifinger, who has stated that "[d]etention centers are extraordinarily high-risk environments for the transmission of infectious diseases," an assertion supported by examples of COVID-19 spreading "like wildfire" in detention facilities around the nation. Greifinger Decl. ¶¶ 14, 19. The Court finds that Petitioners have satisfied the redressability requirement of standing.

## II.    28 U.S.C. § 2241

Petitioners seek their release from ICE detention through a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Under this provision, a district court may grant a writ of habeas corpus if a prisoner "is in custody under or by color of the authority of the United States" or is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c) (2018).  Defendants, however, argue that § 2241 is an inappropriate vehicle for raising what it characterizes as a challenge to Petitioners' conditions of confinement.

In *Preiser v. Rodriguez*, 411 U.S. 475 (1973), the United States Supreme Court, while reaffirming prior decisions allowing inmates to raise challenges to their conditions of confinement as federal civil rights actions, cautioned that "[t]his is not to say that habeas corpus may not also be available to challenge such prison conditions."  *Id.* at 499.  Indeed, it expressly noted that in those decisions, the plaintiffs were not, as Petitioners are here, "seeking immediate release or a speedier release from that confinement—the heart of habeas corpus."  *Id.*  More recently, the Supreme Court has stated that it has "left open the question whether [prisoners] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017).  In the absence of clear guidance, lower courts have split on the extent to which habeas provides a mechanism for asserting challenges to conditions of confinement.  *Wilborn v. Mansukhani*, 795 F. App'x 157, 163 (4th Cir. 2019) (listing cases).

The United States Court of Appeals for the Fourth Circuit has not ruled in a published, binding opinion whether § 2241 is available to challenge conditions of confinement.  *Id.* at 163-64.  Moreover, the Fourth Circuit's unpublished opinions declining to allow certain claims relating to conditions of confinement to be raised through a habeas petition are clearly distinguishable from the instant Petition.  In *Wilborn*, a federal inmate sought to use § 2241 to challenge his housing

assignment within the Bureau of Prisons. *Id.* at 164. In another case, a federal inmate sought to use § 2241 to challenge his failure to receive good conduct credits and a transfer to another facility. *Rodriguez v. Ratledge*, 715 F. App'x 261, 266 (4th Cir. 2017); *see also Braddy v. Wilson*, 580 F. App'x 172 (4th Cir. 2014) (rejecting a federal inmate's use of § 2241 to raise a claim that his conditions of confinement violated the terms of his plea agreement). By contrast, Petitioners are not challenging their placement within their respective detention facilities. Instead, they are seeking release from the facility entirely. *See* Pet. at 30, ECF No. 1 ("Plaintiffs request that this Court . . . [i]ssue a writ of habeas corpus and order Plaintiffs' immediate release or placement in community-based alternatives to detention."); Mot. TRO at 25, ECF No. 2-1 ("Plaintiffs respectfully request that this Court . . . order their immediate release from custody."). Moreover, while the petitioners in the unpublished Fourth Circuit cases were convicted federal prisoners, Petitioners here are civil immigration detainees, who have traditionally had recourse to § 2241 for constitutional challenges to their detention. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 687-88 (2001) (holding that § 2241 was a proper vehicle to challenge an immigration detainee's detention as violating due process due to its length).

In the absence of binding Fourth Circuit authority, this Court concludes, consistent with the positions of several circuits, that a claim by an immigration detainee seeking release because of unconstitutional conditions or treatment is cognizable under § 2241. *See Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (finding that § 2241 is available to challenge a federal detainee's conditions of confinement); *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (same); *Miller v. United States*, 564 F.2d 103, 106 (1st Cir. 1977) (same). First, and most fundamentally, although the grounds on which they seek release relate to their conditions of confinement, Petitioners seek complete release from confinement, which is "the heart of habeas corpus." *Preiser*, 411 U.S. at

498. Second, for immigration detainees, if § 2241 is unavailable, Petitioners may have no vehicle by which to seek redress for the constitutional violation they allege. *Lee v. Winston*, 717 F.2d 888, 892 (4th Cir. 1983) (stating that 42 U.S.C. § 1983 "cannot be used to seek release from illegal physical confinement"), *aff'd*, 470 U.S. 753 (1985); *cf. In re Jones*, 226 F.3d 328, 333 (4th Cir. 2000) (holding that where 28 U.S.C. § 2255 is "inadequate or ineffective" to test the legality of the detention of a federal prisoner, a prisoner may file a habeas petition pursuant to 28 U.S.C. § 2241). The Court will therefore consider the Petition.

## III. TRO

To obtain a TRO or a preliminary injunction, moving parties must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Pashby v. Delia*, 709 F.3d 307, 320-21 (4th Cir. 2013). Because a TRO or a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

### A. Likelihood of Success on the Merits

In asserting their claims, Petitioners cast themselves as civil detainees held in immigration detention. As an initial matter, the Respondents argue that because they are immigration detainees, Petitioners are entitled to lesser constitutional protections as to their detention conditions than other civil detainees. The Court finds Respondents' argument on this score unpersuasive. None of the cases cited by Respondents speaks to the situation here. For example, *Reno v. Flores*, 507 U.S. 307 (1993), while reaffirming the broad notion that Congress has plenary power over immigration

matters in rejecting the argument that the Government may not deprive unaccompanied juvenile immigration detainees of their liberty at all, also reaffirmed that aliens are entitled to "due process of law in deportation proceedings." *Id.* at 305-06. *Mathews v. Diaz*, 426 U.S. 67 (1976), involved a challenge to citizenship requirements for eligibility for certain welfare benefits and thus sheds no light on whether immigration detainees have lesser due process rights than other civil detainees. *Id.* at 80. Where the matter at issue is the conditions of detention, not the right to enter or remain in the United States, the Court rejects Respondents' suggestion that the due process standards for civil detainees do not apply to individuals in immigration detention.

Civil detainees who challenge the conditions of their confinement are protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Youngberg v. Romeo*, 457 U.S. 307, 315 (1982) (stating, in the context of involuntary civil commitment, that "the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause" and "that right is not extinguished by lawful confinement" (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977))). These protections are at least as robust as those of the Eighth Amendment because "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Id.* at 315-16. *Cf. Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (holding that pretrial detainees "retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"). Thus, individuals who have been civilly detained or committed "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-22 (addressing persons subjected to involuntary civil commitment for mental health reasons). *Cf. Bell*, 441 U.S. at 536-

37 (holding that pretrial detainees may be held in custody "so long as those conditions and restrictions [of confinement] do not amount to punishment").

Protections for individuals confined by the state, whether civilly or criminally, include the right to reasonable safety and adequate medical care. *See Youngberg*, 457 U.S. at 315-16l; *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (holding that prison officials are constitutionally required to maintain "humane conditions of confinement," including "the provision of adequate medical care" and taking "reasonable measures to guarantee the safety of the inmates"). "The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

The Supreme Court has made clear as to reasonable safety that the Eighth Amendment "protects against future harm," including a "condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Under this principle, constitutional violations could arise from "the exposure of inmates to a serious, communicable disease" even if "the complaining inmate shows no serious current symptoms" and "even though the possible infection might not affect all those exposed." *Id.*; *see Hutto v. Finney*, 437 U.S. 678, 682-83, 687 (1978) (finding no error in the trial court's conclusion that the conditions of a state prison violated the Eighth Amendment where those conditions included, among other things, daily, random redistribution of mattresses to inmates, some of whom suffered from communicable diseases such as hepatitis and venereal disease); *see*

*also DeGidio v. Pung*, 920 F.2d 525, 526, 533 (8th Cir. 1990) (upholding a district court's ruling that prison officials' response to a tuberculosis outbreak, including their screening and control procedures, was inadequate and violated the Eighth Amendment).

### 1.      Health and Safety

Petitioners argue that Respondents have violated their due process rights by failing to protect them from a known threat to their health and safety: the Coronavirus. In the related context of convicted prisoners, the Eighth Amendment requires that prison officials maintain "humane conditions of confinement," including taking "reasonable measures to guarantee the safety of the inmates." *Raynor*, 817 F.3d at 127. In order to establish an Eighth Amendment claim arising from a failure to ensure reasonable safety or provide adequate medical care, a convicted prisoner must demonstrate that the actions of prison officials amounted to deliberate indifference to the inmate's health and safety. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (establishing deliberate indifference as the standard for Eighth Amendment inadequate medical care claims); *Helling*, 509 U.S. at 32 (applying the deliberate indifference standard to a claim that a communicable disease threatened inmates' health and safety). The Fourth Circuit has held that for due process claims by pretrial detainees of inadequate medical treatment, the Eighth Amendment deliberate indifference standard applies. *See, e.g.*, *Hill v. Nicodemus*, 979 F.2d 987, 991-92 (4th Cir. 1992) ("[P]rison officials violate [a] detainee's rights to due process when they are deliberately indifferent to serious medical needs."); *see also Young v. City of Mount Rainier*, 238 F.3d 567, 575 (4th Cir. 2001) ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."). Since *Hill*, the Supreme Court has called into question the equivalence between the standards applied to claims by pretrial detainees and those applied to claims by post-conviction inmates. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Court held that, unlike the standard applied

to post-conviction detainees' excessive force claims under the Eighth Amendment, the standard for pretrial detainees' excessive force claims under the Fourteenth Amendment includes no subjective component. *Id*. at 2472-73. Several circuits have extended this reasoning to hold that the standard for pretrial detainees' claims of inadequate medical care under the Fourteenth Amendment should likewise not include a subjective component. *See, e.g.*, *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. Cty. of Orange,* 888 F.3d 1118, 1124-25 (9th Cir. 2018). In *Gordon*, for example, the court held that a Fourteenth Amendment claim of inadequate medical care is to be evaluated under an "objective deliberate indifference standard" that requires "more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1125 (requiring that a pretrial detainee show that the defendant did not take "reasonable available measures" to address a medical risk even though "a reasonable official in the circumstances would have appreciated the high degree of risk involved," such that the adverse consequences were "obvious"). Although it is sensible, after *Kingsley*, to conclude that a different, less stringent standard should be applied to the claims of pretrial detainees relating to health and safety, this Court remains bound by Fourth Circuit precedent on this issue as stated in *Hill.*

Neither the Supreme Court nor the Fourth Circuit has expressly decided what standard applies to health and safety or inadequate medical care claims raised by individuals in civil detention. In *Heyer v. United States Bureau of Prisons*, 849 F.3d 202 (4th Cir. 2017), the Fourth Circuit stated that in cases involving civilly committed psychiatric patients, inadequate medical care claims would be governed by the professional judgment standard articulated in *Youngberg*, not by the Eighth Amendment deliberate indifference standard. *Id.* at 209 n.6. However, in *Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017), in deciding the appropriate standard for civil

detainees' claims of unconstitutionally punitive conditions of confinement, the Fourth Circuit expressly drew on the applicable standard for pretrial detainees because it was "natural to borrow" from that context, and that to do otherwise would result in the "unwieldy outcome" of multiple standards "contingent upon the type of civil detention." *Id.* at 275. Coupling the Fourth Circuit's concern in *Matherly* for a uniformity of standards across varied forms of detention with the clear holding in *Hill* that the deliberate indifference standard applies to pretrial detainee claims of inadequate medical care, the Court concludes that the deliberate indifference standard applies to the Fourteenth Amendment health and safety and inadequate medical care claims asserted here.

Under this standard, a plaintiff must satisfy a two-part inquiry that includes both an objective and a subjective component. *See Raynor*, 817 F.3d at 127. First, a plaintiff must show objectively "a serious deprivation" of rights "in the form of a serious or significant physical or emotional injury," *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014), or "a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions," *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" may violate the Constitution, even if "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33–34; *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). To establish the subjective component, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they

could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

To the extent that Petitioners' claims are based in part on their underlying medical conditions and the failure to address it, the medical condition at issue must be objectively serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). If the requisite subjective knowledge is established, an official may avoid liability by responding "reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

As to the objective prong, the available evidence establishes that COVID-19 is a highly communicable disease that presents a potentially mortal risk, particularly for high-risk individuals such as Petitioners. Although the Government disputes the immediacy of that risk to Petitioners, that argument, as discussed above, *see supra* part I.A, lacks merit because "a remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33-34 (rejecting the argument that "only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment"). Here, even without direct evidence that individuals within HCDC and WCDC (collectively, "the Detention Facilities") have contracted the Coronavirus, its spread has been remarkably rapid, including into prisons and detention facilities. Since March 24, 2020, the number of cases in the United States has increased from approximately 54,000 to approximately

250,000. *Cases in U.S.*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/ coronavirus/2019-ncov/cases-updates/cases-in-us.html. There are now approximately 450 cases among detainees and staff at the New York City detention center at Rikers Island. In the past two weeks, it has been reported to have entered immigration detention centers in New Jersey, a federal prison in Louisiana, and the D.C. Jail. It thus presents an imminent risk to health and safety that satisfies the objective prong.

At the same time, as much as Petitioners have sought to paint with broad brush strokes by offering an expert opinion that the nature of immigration detention facilities, including chronic overcrowding, is such that there is a "heightened public health risk" that COVID-19 will spread into such facilities, Greifinger Decl. ¶ 9, the facts relating to the Detention Facilities are of particular importance to the Court's analysis. At the present time, there are no confirmed cases of COVID-19 among detainees or staff at HCDC or WCDC. Both Detention Facilities have adopted procedures to screen individuals entering the facilities, ended non-attorney visits, and stopped receiving new immigration detainees. At the hearing on the Motion, Respondents reported that the immigration detainee population of HCDC has now been reduced to 38 individuals in a facility with a maximum capacity of 100, and the comparable population of WCDC has been reduced to 86 detainees housed in a facility designed for 200 individuals. These conditions contrast markedly with those at other detention facilities described in the press accounts submitted by Respondents, which include a report of 110 men sleeping in the same room. *Immigrants Jailed by ICE are Sick, Panicking, and Can't Get Coronavirus Tests* at 3, Reply Ex. 10, ECF No. 52-10. Thus, although there is an objective risk, it is not at the same level as in other facilities.

Turning to the subjective prong, there is no dispute that Respondents were and are subjectively aware of the risk that COVID-19 poses to both healthy and high-risk individuals. The

issue is whether COVID-19 poses an excessive risk that is being disregarded by Respondents. The evidence supports the conclusion that as of the time of the filing of the Petition and the Motion, on March 24, 2020, Respondents were disregarding the risk. Prior to that date, at HCDC, Respondents had reportedly suspended group programs, including chapel services, and had started holding hearings with ICE detainees by telephone. At WCDC, they had stopped ICE transports of detainees in and out of the facility, and they had suspended visits except for attorney visits. Otherwise, as acknowledged at the hearing on the Motion, there is no evidence that they took any other protective measures. It is undisputed that at both facilities, immigration detainees are housed in close quarters. At HCDC, most immigration detainees are housed in dormitory-like facilities that hold up to 32 people, though Coreas and certain other detainees live in two-person cells. At WCDC, immigration detainees are housed in cells that hold up to two people. Guzman Cedillo presently is in such a cell but without a cellmate. During the day, immigration detainees at both facilities spend approximately 11 hours in communal activities and spaces, where they are in close proximity to one another. Nevertheless, as of the filing of the Motion, communal spaces, including restrooms, were not regularly disinfected. It is undisputed that up to that time, detainees were not provided with cleaning materials for their cells or any or adequate soap or hand sanitizer. No systematic social distancing protocols, even within the limitations of a detention facility, were implemented. Further, the limited number of bathrooms available to the detainees were not disinfected after each use. Such facts lead to the inescapable conclusion that, before this lawsuit, HCDC and WCDC were disregarding the known risk of a highly communicable and potentially fatal disease.

Since the filing of this lawsuit, both Detention Facilities have instituted more COVID-19 mitigation efforts. Respondents assert that detainees are now given soap, hand sanitizer, and

cleaning supplies, and they have increased the frequency of cleaning of high use areas in both facilities. According to Respondents, detainees are now advised on the importance of hand washing and told to seek medical assistance if they become ill. Any individuals allowed to come into the Detention Facilities are screened for body temperature, symptoms, and travel histories. The Detention Facilities have identified housing units that could be used to quarantine individuals who are suspected of having COVID-19. Coreas disputes the claims that cleaning frequency at HCDC has increased, and that HCDC is educating the detainee population on the risks of COVID-19 and how to stop the spread of the Coronavirus.

Although steps in the right direction, these measures leave notable gaps. Despite the fact that the Detention Facilities are not currently at full capacity, there continue to be no social distancing protocols at either facility. Even though ICE claims to be following CDC guidance, there is no evidence of any actions to increase the distance among detainees, whether by moving detainees in double cells to single cells to the extent possible, or by requiring detainees to be separated by empty bunks in the dormitory or empty seats in the dining areas. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (recommending that correctional and detention facilities stagger meal times, rearrange seating in dining halls to allow more space between individuals, and space out bunks to allow six feet between detainees).

More specifically, the Court finds a major deficiency in the lack of any procedures to address the heightened risk to detainees with certain medical conditions. It is undisputed that Coreas has an objectively serious medical condition, diabetes. Regardless of whether he is

receiving otherwise adequate medical care for that condition, diabetes places Coreas at a significantly higher risk of death or serious harm from COVID-19. For individuals in high risk categories such as Petitioners, the available data shows that the death rate for those with COVID-19 is between 15 percent and 20 percent. While adequate treatment for Coreas's condition would necessarily require separation from, or at least minimization of contact with, other detainees, Respondents have taken no general or specific steps to meet this medical need for distancing, whether by providing Coreas with his own cell and otherwise distancing him from other detainees.

Finally, although the Detention Facilities have instituted screening procedures for entering individuals, they have not conducted any tests for COVID-19, and they have neither the capability nor any plans to do so. This fact not only calls into question the claim that there are no confirmed cases of COVID-19 in either HCDC or WCDC, it also exposes a serious vulnerability, where Petitioners have reported many people coughing and sneezing at HCDC and have identified at least three individuals at HCDC who have symptoms consistent with COVID-19 but have never been tested.

If any detainee or staff member at HCDC or WCDC were known to have COVID-19, the Court would conclude that these identified deficiencies, particularly the absence of *any* steps to address Coreas's obvious medical need for separation from others, would establish knowing disregard of a serious medical need constituting deliberate indifference that would likely violate the Constitution. *See Coronel*, 2020 WL 1487274, at *4-6 (finding deliberate indifference to the medical needs of high-risk detainees for social distancing where the Coronavirus was known to be in a detention facility and "the record demonstrates that ICE has not taken any action to address the particular risks COVID-19 poses to high risk individuals like Petitioners here"); *Basank*, 2020 WL 1481503, at *5 (finding deliberate indifference in the absence of social distancing within the

detention facility and the absence of any "steps to protect high-risk detainees like Petitioners" in facilities where the Coronavirus was present). Where Guzman Cedillo also has an objectively serious medical condition—hypertension—which creates a specific need for distancing from others and which Respondents have taken no steps to address, the Court would reach the same conclusion as to Guzman Cedillo.

At this point, however, where there is no evidence that the Coronavirus is present in either HCDC or WCDC, and Respondents have instituted a screening procedure for those entering the facilities, have suspended non-attorney visits, and have stopped transfers of immigration detainees into the facility, the direct threat to Petitioners remains sufficiently attenuated that the Court will not find that the identified deficiencies have established a likelihood of success on the merits of Petitioners' claim of deliberate indifference to their health and safety or their serious medical needs. Indeed, in cases in which there were no cases of COVID-19 associated with the detention facility, courts have declined to find a likelihood of constitutional violations and to grant a TRO. *See Sacal-Micha*, 2020 WL 1518861, at *6; *Dawson*, 2020 WL 1304557, at *1. Although at least one federal court has found constitutional violations warranting release of immigration detainees even before the appearance of COVID-19 in a facility, *see Castillo*, 2020 WL 1502864, at *6, the facility at issue in that case, the Adelanto ICE Processing Center in California, is a substantially larger facility with more crowded conditions and a history of health and safety risks. *Id.* at *1-2; *see* Office of Inspector Gen., *Management Alert: Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California*, U.S. Dep't of Homeland Sec. at 2 (Sept. 27, 2018), https://www.oig.dhs.gov/sites/default/files/assets/Mga/2018/oig-18-86-sep18.pdf. In contrast, the Detention Facilities are substantially below capacity, and Guzman Cedillo already has his own cell. Under the present facts, the Court will not find a likely constitutional violation.

However, the Court recognizes that where HCDC and WCDC are currently unable or unwilling to test for the Coronavirus, there would be no way to determine whether it has entered one of the Detention Facilities. Accordingly, the Court concludes that in the event that the Coronavirus is found in HCDC or WCDC, or if those facilities fail to submit a timely certification that they have obtained COVID-19 tests and will administer a test to any individual at either Detention Facility who exhibits suspected COVID-19 symptoms ("Testing Certification"), the Court would find a likelihood of success on the due process claim based on deliberate indifference to the serious medical needs of Petitioners.

### 2. Conditions of Confinement

Petitioners separately argue that their detention under the specter of the Coronavirus violates due process because it effectively constitutes impermissible punishment. To establish such a claim, civil detainees must show either that (1) the condition was imposed with the express intent to punish; or (2) it is not reasonably related to a legitimate, nonpunitive governmental objective, such that the intent to punish can be inferred. *Matherly*, 859 F.3d at 275 (considering whether an individual detained in advance of a determination whether he should be civilly committed as a sexually dangerous person was subjected to conditions of confinement that were unconstitutionally punitive). As to the second prong, "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Id.* In assessing whether such a relationship exists, courts consider, as applicable, whether "professional judgment" was exercised in balancing "the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints." *Id.*; *Youngberg*, 457 U.S. at 321.

On the first factor, the Court finds no evidence in the record that the conditions of Petitioners' confinement were imposed with the express intent to punish. The Court thus turns to whether the challenged conditions of confinement are reasonably related to a legitimate, nonpunitive governmental objective. *Matherly*, 859 F.3d at 275. Although the Court agrees with Respondents that ordinary detention at HCDC or WCDC would be reasonably related to the legitimate governmental objective of ensuring an immigration detainee's presence at an immigration hearing, the present conditions of confinement are markedly different. At this point, Petitioners are confined in facilities where they are particularly vulnerable to COVID-19 because of the lack of ability to maintain distance from others, and if they contract the Coronavirus they have up to a 20 percent chance of death, greater than the odds of losing a game of Russian roulette. If it were known that there were cases of Coronavirus within the detention facility, the Court would conclude that for high-risk immigration detainees, who are held not for the purpose of answering to criminal charges, but merely to face civil status violations, such conditions imposing a palpable risk of death or serious harm inflict far more serious consequences on them than are justified by the need to hold them for their immigration proceedings. Thus, upon consideration of the governmental interest and the detainee's right to reasonable conditions of safety, such conditions would bear no reasonable relationship "to the purpose for which persons are committed" and would violate due process. *Matherly*, 859 F.3d at 275; *see Thakker v. Doll*, 1:20-cv-00480-JEJ, Doc. No. 47.

At present, however, there are no confirmed cases of COVID-19 in the Detention Facilities. Although in *Thakker*, the court found conditions of confinement at three detention facilities to constitute unconstitutional punishment in light of COVID-19 even though only one of the facilities had a known case of COVID-19, the court relied in part on the fact that the facilities had significant

overcrowding and unsanitary conditions, including the presence of rats. *Thakker*, Doc. No. 47 at

14, 20-21. Here, unlike most immigration detention facilities, HCDC and WCDC are substantially

below capacity. Under the specific circumstances before it, the Court does not find that the threat

of the Coronavirus in society generally, as opposed to its presence inside a detention facility,

inflicts unconstitutional punishment on high-risk detainees. To adopt Petitioners' position would

be to hold that the detention of any high-risk immigration detainee during the pandemic is

necessarily unconstitutional, a position that the Court is not presently prepared to adopt.

The Court is aware, however, that although there is no direct evidence that the Coronavirus

has entered the Detention Facilities, there are individuals at HCDC with symptoms consistent with

COVID-19, and neither HCDC nor WCDC has the capability to test anyone for the Coronavirus.

Unless Respondents are able to provide the Testing Certification referenced above, the Court

would consider the lack of a testing capability to be the equivalent of having positive tests in the

detention facility, as there would be no way to know whether high-risk detainees are at direct risk

of exposure to the Coronavirus. Thus, while the Court does not presently find a likelihood of

success on the merits on this claim, it would so find upon either a showing of evidence that a

detainee or staff member at HCDC or WCDC has COVID-19, or upon Respondents' failure to

provide the Testing Certification by the stated deadline. Accordingly, while the Court's conclusion

on the likelihood of success on the merits precludes issuance of a TRO at the present time, *Pashby*,

709 F.3d at 320-21, it will address the remaining prongs and make findings in the event of a future

determination of a likelihood of success on the merits.

### B.    Irreparable Harm

On the issue of irreparable harm, the Court finds that in the event that Petitioners were able

to establish a likelihood of success on the merits on their constitutional claims, they would also be

irreparably harmed. "Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 551 F.3d 546, 551 (4th Cir. 1994). The Fourth Circuit has held that "the denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (noting that "[c]ourts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights" and collecting cases). More specifically, Petitioners have introduced uncontroverted evidence that contracting COVID-19 would put them at serious risk of severe medical complications and even death. As discussed above, Petitioners' medical experts place the risk of death for high-risk individuals at 15 to 20 percent. Moreover, Dr. Greifinger notes that those who do not die from COVID-19 suffer "prolonged serious illness" and that once COVID-19 is introduced into a detention facility, "it spreads like wildfire." Greifinger Decl. ¶¶ 6, 14. Thus, in the event that a detainee or staff member were found to have COVID-19, or if Respondents fail to submit the Testing Certification such that there would be no way to confirm its presence, there would be a high likelihood of irreparable health consequences that could not be alleviated without release. Respondents' assertion that "detainees who present symptoms compatible with COVID-19 will be placed in isolation" does not remove the risk that the virus will spread quickly once inside the facility and would specifically threaten high-risk detainees like Petitioners. Moon Decl. ¶ 9. Because Petitioners would face a significant risk of death or serious illness under such circumstances, the Court would find likely irreparable harm. *See Multi-Channel TV Cable Co.*, 22 F.3d at 551.

### C.      Balance of the Equities and the Public Interest

When a plaintiff seeks preliminary injunctive relief against the Government, the balance of the equities and the public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting, in the context of a plaintiff's suit seeking a stay of removal proceedings, that the balance of equities and public interest "factors merge when the Government is the opposing party"); *Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020) (citing *Nken* in the context of a preliminary injunction).

To the extent that the Court were to find a likelihood of success on the merits, it would necessarily find that the detention and treatment of Petitioners would violate due process. Generally, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). Moreover, the significant risk that the Coronavirus, upon entering HCDC or WCDC, would cause death or serious harm to high-risk detainees like Petitioners, weighs in favor of the requested injunction.

In contrast, however, Respondents express a public interest in the detention of Petitioners grounded both in the general public interest in immigration enforcement, *see Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981), as well as the specific interest in upholding the statutory requirement that these particular detainees are subject to mandatory detention under 8 U.S.C. § 1226(c). As to the general interest, the Court recognizes that it weighs in favor of Respondents, but concludes that it is of markedly less importance than the interest in incarceration of convicted federal or state prisoners, or even the detention of individuals formally charged with federal or state criminal offenses. Thus, the balance of equities in a case involving civil detention tips significantly less favorably toward the Government than in a case involving criminal pretrial detention or post-conviction imprisonment.

As to the specific interest, unlike decisions facing judges relating to individuals who are detained solely because they cannot afford bail, or those relating to immigration detainees who are not subject mandatory detention and for whom there is no specific concern about risk of flight or danger to the community, here, Petitioners both have prior convictions for serious offenses. Coreas was convicted in 2007 of arson and burglary, while Guzman Cedillo was convicted of aggravated assault in 2010. Although these convictions are dated and do not necessarily establish any present risk to the community, it cannot be said that there is no public interest in detention. Furthermore, there is evidence that Coreas would present a risk of non-appearance at his immigration hearing. After he was convicted in this Court in 2015 of illegal reentry after deportation, Coreas was placed on supervised release which required him, if not deported, to report to the United States Probation Office upon release and to not commit any additional crimes. However, when he was released by state authorities after they dismissed charges against him for operating a prostitution business, Coreas did not report to Probation as ordered by this Court, and instead relocated to Iowa, where he was off the radar until he was identified by law enforcement three years later, in 2019, after committing a drug possession crime. Thus, unlike in other cases in which judges have found little or no risk of flight, where Coreas has a demonstrated history of disregarding the orders of this Court specifically, it cannot make such a finding here. Thus, there is a public interest in continued detention in order to have Coreas available for his immigration proceedings.

While Respondents' interests explain why an injunction granting Petitioners' release should not occur prematurely, they do not provide a basis to conclude that upon a finding of a likely constitutional violation, the balance of equities and public interest would not favor release. Although the remedy for unconstitutional conditions of confinement is typically a requirement that the conditions be modified, *Dawson*, 2020 WL 1304557, at \*2, neither party has identified any

steps that could be taken that would adequately address any unconstitutional conditions short of release. On balance, the interests of the health and safety of Petitioners would outweigh the public interest in the assurance of the completion of civil proceedings, particularly where ICE would be able to impose conditions of release using "a range of highly effective tools" designed to result in Petitioners' appearances at their hearings. *See* Lorenzen-Strait Decl. ¶ 15, Mot. TRO Ex. 3, ECF No. 2-5. Thus, upon a finding of a likelihood of success on the merits, this prong would favor issuance of the requested injunction.

## CONCLUSION

For the foregoing reasons, the Motion for a Temporary Restraining Order will be DENIED WITHOUT PREJUDICE. Petitioners may renew the Motion, without leave of the Court, in the event of (1) evidence that a detainee or staff member at HCDC or WCDC has COVID-19; (2) the failure of Respondents to file a Testing Certification by **Wednesday, April 8, 2020** that HCDC and WCDC have COVID-19 tests and will administer a test to any individual at HCDC or WCDC with suspected COVID-19 symptoms; (3) the postponement of a Petitioner's currently scheduled immigration hearing; or (4) other materially changed circumstances. Any renewed Motion will be handled on an extremely expedited basis and may be decided without a hearing. Respondents will be ORDERED to (1) immediately inform the Court and Petitioners of any evidence that a detainee or staff member at HCDC or WCDC has COVID-19; and (2) immediately provide to the Court and Petitioners, upon execution, the above-described Testing Certifications as to both HCDC and WCDC. A separate Order shall issue.


Date: April 3, 2020                              /s/ *Theodore D. Chuang*
                                                 THEODORE D. CHUANG
                                                 United States District Judge