# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| MAURICIO COREAS,<br>ANGEL GUZMAN CEDILLO and<br>WILLIAM KEMCHA,<br><br>    Petitioners,<br><br>    v.<br><br>DONNA BOUNDS,<br>*in her official capacity as Warden*,<br>*Worcester County Detention Center*,<br>JACK KAVANAUGH,<br>*in his official capacity as Director*,<br>*Howard County Detention Center*,<br>JANEAN OHIN,<br>*in her official capacity as*<br>*Acting Baltimore Field Office Director*,<br>*U.S. Immigration and Customs Enforcement*,<br>MATTHEW T. ALBENCE,<br>*in his official capacity as Deputy Director*<br>*and Senior Official performing the duties of*<br>*the Director of the U.S. Immigration*<br>*and Customs Enforcement*,<br>and<br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT,<br><br>    Respondents. | Civil Action No. TDC-20-0780 |

**MEMORANDUM OPINION**

Pending before the Court is a Renewed Motion for a Preliminary Injunction by Petitioners Angel Guzman Cedillo and William Kemcha seeking release from the Worcester County Detention Center in Snow Hill, Maryland ("WCDC") at which they are detained by United States Immigration and Customs Enforcement ("ICE") on alleged or established immigration violations. At a case management conference on April 27, 2020, the parties agreed that upon completion of

briefing, the Motion could be resolved without a hearing. The Motion is now fully briefed, and the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

## BACKGROUND

### I. Procedural History

On April 3, 2020, the Court issued a Memorandum Opinion and Order denying without prejudice a Motion for a Temporary Restraining Order ("TRO") ("the First Motion") in which Petitioners Guzman Cedillo and Mauricio Coreas sought release based on their claim that their continued ICE detention during the COVID-19 pandemic violated their right to due process under the Fourteenth Amendment to the United States Constitution. *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at *1, *5 (D. Md. Apr. 3, 2020) ("*Coreas I*"). In that opinion, the Court concluded that although it did not find a likelihood of success on the merits of Guzman Cedillo's claim in light of the lack of any evidence that the Coronavirus had entered WCDC, it would find a constitutional violation likely upon either a showing that a detainee or staff member at WCDC had tested positive for COVID-19, or upon Respondents' "fail[ure] to submit a timely certification that they have obtained COVID-19 tests and will administer a test to any individual at [the] Detention Facility who exhibits suspected COVID-19 symptoms." *Id.* at *11-13. The Court also found that under such circumstances, the Court would find likely irreparable harm to Guzman Cedillo and that the balance of the equities and the public interest would favor release. *Id.* at *13-14. Where the vast majority of the analysis necessary to resolve the present Motion is set forth in *Coreas I*, the Court fully adopts, restates, and incorporates by reference *Coreas I* as part of this Memorandum Opinion.

In *Coreas I*, the Court denied the First Motion without prejudice and stated that Petitioners could renew the Motion under certain circumstances, including if Respondents failed to certify that they would administer a COVID-19 test to "any individual at . . . WCDC with suspected COVID-19 symptoms" or if there were "other materially changed circumstances." *Coreas I*, 2020 WL 1663133, at *15. Although Guzman Cedillo had an immigration hearing on April 17, 2020, an additional hearing before an immigration judge was scheduled for June 6, 2020. On April 26, 2020, Petitioners filed an Amended Complaint in which Kemcha was added as a Petitioner. On April 27, 2020, Coreas filed a Renewed Motion for a Preliminary Injunction seeking his release from the Howard County Detention Center in Jessup, Maryland, which was granted on April 30, 2020. On April 28, 2020, Guzman Cedillo and Kemcha (hereinafter, "Petitioners") filed the present Motion seeking release from WCDC.

## II.   WCDC

With the Motion, Petitioners have provided new evidence that at least one WCDC detainee, Esvin Octavio Benavente-Perez, had symptoms of COVID-19 yet was not tested. Specifically, Benavente-Perez began to develop a severe cough on or about March 20, 2020 and reported his symptoms to a nurse. He was later placed in an isolation cell near the nurse's office and as his cough persisted, he also reported that he believed he had a fever and that his chest and lungs were hurting. On March 27, 2020, he was provided with a face mask and instructed to wear it at all times. Correctional officers and medical staff who entered his cell wore full protective suits, similar to hazmat suits, as well as masks and gloves. On April 3, 2020, through a translator, Benavente-Perez was told that he was isolated because he was showing COVID-19 symptoms. On April 8 and 9, his cough remained and he still had chest pain, but his fever had declined. He was released from isolation on April 11, 2020.

Medical records confirm that as of March 27, 2020, Benavente-Perez had a cough, chest discomfort, a sore throat, and a fever of 99.3 degrees and was placed in an isolation cell at the direction of WCDC Warden Donna Bounds. As of March 30, his fever was 99.8 degrees. Although his fever later declined, from March 30 and continuing until at least April 2, Benavente-Perez was still required to wear a mask, including in the shower and while on the telephone, and medical staff continued to wear personal protective equipment ("PPE") during their encounters with him. On April 2, 2020, Benavente-Perez was moved from the medical unit to "secondary housing" to complete a quarantine period. Benavente-Perez Med. Records ("Med. Records II") at 34, ECF No. 92-24. On April 10, 2020, WCDC's tracking chart noted that Benavente-Perez had "completed 14 day quarantine for suspected COVID-19 infection," that he had remained fever-free and no longer claimed symptoms, and was cleared to return to the general population. *Id.* at 37.

The medical records specifically state that Benavente-Perez was monitored for "suspected COVID-19" on April 1 and "possible COVID-19 infection" on April 2. Benavente-Perez Med. Records ("Med. Records I") at 3-4, 73, Renewed Mot. Prelim. Inj. Ex. 75, ECF No. 81. Moreover, WCDC tracked Benavente-Perez's progress on forms entitled "Patient Monitoring for Confirmed or Suspected COVID-19," with a subheading of "Monitoring of Symptomatic patient with suspected or confirmed COVID-19," from March 28 to April 2, 2020. Med. Records I at 20-32. WCDC also maintained a tracking chart with each entry for Benavente-Perez during those same dates containing the designation "Patient Monitoring for Confirmed or Suspected COVID-19." Med. Records II at 27-34. Nevertheless, Benavente-Perez was never tested for COVID-19.

On April 25, 2020, Benavente-Perez had chest pains, cold sweats, shortness of breath, and a fever of 99.3 degrees. He was sent to a hospital because of concerns about his heart condition,

but during that visit his electrocardiogram was deemed normal. He was returned to WCDC and underwent 14 days of quarantine because he left the facility.

In addition to Benavente-Perez, since March 27, 2020, there were two other immigration detainees who were moved to the medical housing area because of elevated temperatures and were isolated and monitored for 14 days. According to Warden Bounds, they were not tested for COVID-19 because their temperatures did not go above 100 degrees. According to medical records, on April 3, 2020, one of these detainees had a temperature of 99.8 degrees and had a cough that was a 7 on a scale of 1-10. Warden Bounds was notified, and the detainee was directed to wear a mask, staff wore mask and gloves when interacting with him, and the detainee was isolated until April 6.

### III.  William Kemcha

Petitioner William Kehdinga Kemcha, a native and citizen of Cameroon, has lived in the United States for 33 years and has a wife and two United States citizen daughters who reside in Maryland. He is 58 years old and suffers from high blood pressure and lymphedema. Kemcha's lymphedema is the result of surgery he had to remove a malignant mole on the sole of his foot and has caused him to have a compromised immune system. One of Petitioners' expert witnesses, Dr. Kate Sugarman, has submitted a declaration attesting that Kemcha's age, his hypertension, and his compromised immune system each independently increase his risk of serious complications or death from COVID-19. Sugarman Decl. ¶ 6, Renewed Mot. Prelim. Inj. Ex. 76, ECF No. 79-8. *See also Groups at Higher Risk for Severe Illness*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-conditions (last visited May 7, 2020) (identifying hypertension and compromised immune systems based on cancer treatment as high-risk conditions). Indeed, based on recent data,

Kemcha's status as a cancer patient alone puts his risk of dying from COVID-19 at double that of the general population. Sugarman Decl. ¶ 6. Together, these conditions and his age leave Kemcha "at extremely high risk of serious illness or death should he contract COVID-19." *Id.*

Kemcha first entered the United States in 1987 on an F-1 student visa. In 1995, Kemcha was placed in removal proceedings after overstaying his visa. In 1998, an immigration judge denied Kemcha's applications for relief, and that determination was affirmed by the Board of Immigration Appeals in 2002. In December 2009, Kemcha was arrested by ICE at his home in Laurel, Maryland, but ICE could not secure a travel document for his removal and released him in January 2010 on conditions of supervision. Kemcha reported to ICE as directed for the ensuing nine years, until he was again taken into custody in September 2019. Kemcha was scheduled to be removed back to Cameroon on April 1, 2020, but on March 30, 2020 the flight was canceled due to COVID-19 concerns. As of now, another flight is not available until June 2020.

## DISCUSSION

In the Motion, Petitioners argue that release is now warranted because the Court's prior denial of the First Motion was predicated on Respondent's certification that WCDC would test for the Coronavirus any detainee exhibiting symptoms of COVID-19, and they have now uncovered evidence that Respondents failed to test at least one such individual. Respondents assert that there is no reason to revisit the Court's prior ruling because no violation of the testing protocol occurred.

**I.   Legal Standard**

In order to succeed on a motion for a preliminary injunction, a party must establish (1) a likelihood of success on the merits; (2) a likelihood of "irreparable harm in the absence of preliminary relief"; (3) that the balance of equities tips in the moving party's favor; and (4) that

"an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## II. Likelihood of Success on the Merits

In ruling on the First Motion, the Court found that in the event that a detainee or staff member at WCDC tested positive for COVID-19, or that WCDC failed to commit to test any individual at WCDC who had suspected COVID-19 symptoms, the conditions of confinement for Guzman Cedillo, the deficiencies in Respondents' mitigation measures at WCDC, and Guzman Cedillo's status as a detainee with a high-risk health condition that places him at heightened risk of death or serious illness from COVID-19 would collectively establish a likelihood of success on the merits of his constitutional claim. *Coreas I*, 2020 WL 1663133, at *11-13. The Court reaffirms and adopts this reasoning as relevant and applicable to the present Motion. Where, based on the facts set forth above, the Court finds that Kemcha also has high-risk medical conditions that place him at a risk from COVID-19 comparable to or greater than that faced by Guzman Cedillo, the Court adopts the same reasoning, as applicable, to Kemcha's claim. *See id.*

Petitioners have now presented compelling evidence that a detainee at WCDC had suspected COVID-19 symptoms yet was never tested. On or about March 20, 2020, Benavente-Perez developed a severe cough. No later than March 27, 2020, Benavente-Perez reported to the medical staff that he had a cough, chest discomfort, a sore throat, and a fever. He was placed in an isolation cell and required to wear a mask when showering and using the telephone. Medical staff wore PPE when interacting with Benavente-Perez, kept him in an isolation cell until April 2, then transferred him to a different cell where he remained quarantined until April 11. According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 symptoms include cough, shortness of breath, fever, sore throat, muscle pain, headache, and chills, and that someone with a

cough or shortness of breath, or with any two of the other symptoms, may have COVID-19. *Symptoms of Coronavirus*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 7, 2019). *See also* Golob Decl. ¶ 5, Reply Mot TRO Ex. 7, ECF No. 52-7 (identifying the most common symptoms of COVID-19 as fever, cough, and shortness of breath). Where Benavente-Perez had a severe cough, fever, sore threat, and discomfort in his chest, the Court finds that Benavente-Perez had suspected COVID-19 symptoms.

Respondents cannot and do not seriously dispute that Benavente-Perez had suspected COVID-19 symptoms. Rather, they argue that there was no violation of the Court's testing requirement because under the guidance of their health care contractor, Wellpath, no test is required unless an individual's temperature exceeds 100 degrees, and in any event by the time of the Court's April 3 Order requiring testing, there was no need to test Benavente-Perez because he no longer had symptoms and had improved sufficiently that he had been moved out of the medical unit, though he remained quarantined until April 11. This hypertechnical reasoning is unpersuasive. In its April 3 Order, the Court required testing of "any individual at . . . WCDC with suspected COVID-19 symptoms," without an exception for individuals whose fever did not exceed 100 degrees. Apr. 3, 2020 Order at 2, ECF No. 57; *Coreas I*, 2020 WL 1663133, at *14. Moreover, Benavente-Perez had been explicitly identified on forms as "suspected COVID-19" as of April 2, he continued to have a cough as of April 8 and 9, and he remained in quarantine until April 11, eight days after the April 3 Order, because he had had COVID-19 symptoms. Under any fair reading of the Court's Order, he should have been tested.

Even if the language of the Court's Order could be parsed in a way to support the argument that there was no violation of the Court's mandated testing protocol, this episode with Benavente-

Perez remains highly significant for two reasons. First, there can be no dispute that as of March 27, 2020, Benavente-Perez represented a suspected case of COVID-19 at WCDC. For proof, one need look no further than WCDC's own medical records, which tracked information about Benavente-Perez through April 2, 2020 on forms and charts with the designation, "Patient Monitoring for Confirmed or Suspected COVID-19," with a subheading, "Monitoring of Symptomatic patient with suspected or confirmed COVID-19." Med. Records I at 20-32. Yet in a declaration under penalty of perjury filed with the First Motion, the ICE Deputy Assistant Director for Healthcare Compliance attested to the fact that as of March 27, 2020, "[t]here are zero suspected cases of COVID-19 in . . . the Worcester County Jail." Moon Decl. ¶ 12, Opp'n Mot. TRO Ex. 2, ECF No. 39-2. This statement, which the Court relied upon in deciding the First Motion, proved to be demonstrably false. Even assuming that the inaccuracy was unintentional at the time, such as because Benavente-Perez's condition was just emerging and had yet to be identified and reported up the chain to ICE by the time the declaration was signed, the declaration was not filed with the Court until March 30, three days later, and the Court did not issue its ruling on the first Motion until April 3, 2020, almost a full week after Benavente-Perez was identified as a "symptomatic patient with suspected or confirmed COVID-19." Med. Records I at 20-32. Respondents' withholding of this information and failure to correct the record on this point either before or after the Court ruled on the First Motion raises significant doubt whether WCDC will reveal suspected cases when they arise so as to facilitate proper testing and responsive measures to protect the detainee population, or whether it will conceal suspected cases in the future and take no action, at substantial risk to the detainee population.

Second, WCDC's unilateral decision not to test Benavente-Perez, and perhaps the other detainees who were isolated because of elevated temperature levels, is highly probative on the

issue of deliberate indifference. To the extent that WCDC claims that a detainee it labeled as "suspected COVID-19" did not need to be tested because his temperature did not reach a particular threshold, it reflects an unreasonably high tolerance for the potential presence of undetected cases of COVID-19 inside WCDC. WCDC identifies no scientific basis to conclude that a symptomatic detainee whose temperature did not reach 100 degrees does not have COVID-19. Indeed, it is understood that even asymptomatic individuals can be carrying the Coronavirus. *See* Golob Decl. ¶ 6. Even if such a testing protocol may be deemed acceptable under certain conditions, in a prison setting, where the risk of widespread transmission is so high and can have such devastating effects, the choice of such a standard does not sufficiently protect the detainee population. *See* Greifinger Second Decl. ¶ 6, Renewed Mot. Prelim. Inj. Ex. 53, ECF No. 76-6 ("Once COVID-19 is introduced into [detention] facilities, it spreads like wildfire."). By having unilaterally adopted and applied such a rule, under which WCDC will not test individuals whose symptoms otherwise cause them to be labeled by WCDC's own medical staff as "suspected COVID-19," WCDC has shown that it is willing to disregard a known "excessive risk to inmate health and safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Furthermore, Respondents' argument that WCDC was not required to test Benavente-Perez because his symptoms had subsided by the time the Court issued its Order reveals that WCDC's interest was in doing the minimum amount required by the Court's Order, or in avoiding learning whether the Coronavirus had entered the facility because of the obligations that such knowledge would bring, rather than in acting to safeguard individuals inside the facility. At the time the Court issued its April 3 Order, Benavente-Perez had just been moved out of medical isolation but remained under quarantine for another week. He was one day removed from being identified as "suspected COVID-19." Med. Records I at 20. Beyond whether it was required by the Court's

Order, Respondents have provided no principled reason not to have tested Benavente-Perez, either before or after the Court's Order, when it was clear that he had had COVID-19 symptoms. Thus, to the extent that Respondents chose not to test him or other similarly situated detainees because their symptoms had subsided, that decision further supports a finding of likely deliberate indifference to inmate health and safety. Indeed, had the Court not been misled by Respondents' claim that there were no suspected COVID-19 cases at WCDC, and had it known that such a detainee existed but would not be tested, it likely would have reached a different conclusion on the First Motion.

In its opinion on the First Motion, the Court concluded that in the absence of testing for COVID-19 at WCDC, there would likely be a constitutional violation because in that circumstance, the deficiencies in the mitigation measures in effect at that time would establish deliberate indifference to the health and safety of high-risk detainees such as Petitioners. *Coreas I*, 2020 WL 1663133, at *11-12. In particular, the Court identified the lack of any social distancing measures, the lack of any accommodations to protect detainees with high-risk health conditions, and the lack of any testing for COVID-19 as notable deficiencies. *Id.* at *11. Based on Respondents' submission, although some additional measures have been adopted since April 3, such as the wearing of masks inside the facility, none of these identified deficiencies have been addressed. Even though WCDC remains below capacity, no social distancing measures have been implemented. No policies specifically aimed at protecting detainees with high-risk health conditions have been adopted. And as discussed above, the Court now knows that WCDC was aware of at least one detainee, and possibly two more, with suspected COVID-19 but failed to test him without good reason. Thus, the Court finds that where the identified deficiencies in mitigation measures remain, but the record now reflects that WCDC has been unwilling to test for the

Coronavirus even when detainees are suspected of having COVID-19, this combination of facts reveals likely deliberate indifference to inmate health and safety. Moreover, the Court separately concludes that its prior finding that the detention of a civil detainee with a high-risk health condition in a facility without any testing for COVID-19 likely imposes unconstitutional punishment because the conditions bear no reasonable relationship to the purpose of the detention, *id.* at *12-13, applies equally to a facility in which a detainee with known symptoms of COVID-19 was never tested. Accordingly, the Court finds a likelihood of success on the merits of Petitioners' constitutional claim.

### III.     Remaining Factors

In *Coreas I*, the Court found that if it concluded that there was a likelihood of success on the merits, there would be likely irreparable harm to Guzman Cedillo, and that the balance of the equities and the public interest would favor his release. *Id.* at *13-14. The Court reaffirms and adopts this general reasoning as relevant and applicable to the present Motion as to both Petitioners. Particularly given the failure to address the previously identified deficiencies in mitigation measures and WCDC's overly narrow approach to testing, the Court finds that these factors have been satisfied as to Guzman Cedillo. *See id.*

As for Kemcha, who was not a Petitioner at the time of the First Motion, where, as discussed above, there is no dispute that Kemcha has a high-risk medical condition that makes him particularly vulnerable to COVID-19, the Court finds that by the same reasoning, there is a likelihood of irreparable harm to him. *See id.* The Court also finds that the balance of the equities and public interest tip substantially in his favor. Beyond the general analysis set forth in *Coreas I*, the Court notes that Kemcha has no known criminal history, so he would present no discernible risk to the public if released. Although the fact that Kemcha is being detained pursuant to a final

order of removal arguably increases his risk of flight, Kemcha has been subject to an order of removal since 2010, and for the ensuing nine years, until he was returned to custody in 2019, Kemcha reported to ICE as directed. In light of Kemcha's extended track record of compliance with reporting requirements and the fact that his wife and United States citizen daughters live in Laurel, Maryland, the Court finds that the although there is a public interest in the enforcement of immigration laws, there is only a limited interest in Kemcha's continued detention until his removal, and that such interest is outweighed by Kemcha's interest in reducing his risk of exposure to a potentially deadly disease. Where no alternative means of addressing that risk have been offered, both the balance of the equities and the public interest favor release.

### IV.    Preliminary Injunction

Where the Court has found that all four prongs of the preliminary injunction analysis have been met, the Motion will be granted. *See Winter*, 555 U.S. at 20. This ruling is consistent with those of numerous federal courts across the nation that have ordered the release of immigration detainees based on the imminent threat of the Coronavirus to those with high-risk health conditions, even when no cases of COVID-19 had been confirmed in the relevant facilities. *See, e.g.*, *Favi v. Kolitwenzew*, No. 20-2087, 2020 WL 2114566, at *3, *12 (C.D. Ill. May 4, 2020); *Pimentel-Estrada v. Barr*, No. 20-0495 RSM-BAT, 2020 WL 2092430, at *13, *19 (W.D. Wash. Apr. 28, 2020); *Perez v. Wolf*, No. 19-5191 (EJD), 2020 WL 1865303, at *12, *13-14 (N.D. Cal. Apr. 14, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *9, *14 (E.D. Mich. Apr. 5, 2020); *Thakker v. Doll*, No. 20-0480, 2020 WL 1671563, at *3, *10 (M.D. Pa. Mar. 31, 2020) (granting release from three detention facilities, only one of which had a positive test for COVID-19). In granting this relief, these courts have focused on some of the same factors present here, including the possibility of asymptomatic transmission, *see Pimentel-Estrada*, 2020 WL 2092430,

at *12 ("The biggest threat comes from Respondents' inability to identify asymptomatic carriers as staff, contractors, vendors, attorneys, and visitors come and go between the detention center and the broader community where COVID-19 has been spreading."); *Malam*, 2020 WL 1672662, at *9; *Favi*, 2020 WL 2114566, at *10 ("Screening, however, will only allow the facility to identify individuals with active symptoms, not those asymptomatic individuals who can nevertheless spread the virus undetected."); the failure or refusal of facilities to implement necessary testing, *see Pimentel-Estrada*, 2020 WL 2092430, at *15 ("[G]iven this limited testing, a lack of proven cases cannot establish that COVID-19 is not already present at [the facility]."); and the inability of detainees to effectively practice social distancing, *see id*. at *13 ("Respondents continue to house . . . detainees in conditions that make it practically impossible to maintain adequate social distancing throughout the day."); *Perez*, 2020 WL 1865303, at *12 ("[T]he structure of detention facilities, which are designed to house multiple people in close proximity, render any sanitation efforts somewhat meaningless as detainees cannot social distance."); *Malam*, 2020 WL 1672662, at *8 ("Respondents have confined Petitioner in an environment where she shares toilets, sinks, phones, and showers, eats in communal spaces, and is in close contact with the many other detainees and officers."); *Favi*, 2020 WL 2114566, at *10 (relying on the "lack of meaningful ability to social distance").

Accordingly, Petitioners will be ordered released on the conditions proposed by ICE, as modified in the accompanying Order, as well as the following conditions: (1) maintaining residence at their respective designated addresses in Maryland and self-quarantining there for the first 14 days following their release; and (2) location monitoring, at the discretion of ICE. Guzman Cedillo shall also comply with the terms of supervised release set in *United States v. Guzman*, No.

ELH-19-0139 (D. Md.), including reporting, by telephone if necessary, to the assigned United States Probation Officer within 72 hours of release from ICE custody.

Finally, the Court will not require a bond in this case. Although "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), the Court "retains the discretion to set the bond amount as it sees fit or waive the security requirement." *Pashby v. Delia*, 709 F.3d 307, 331-32 (4th Cir. 2013). Where Petitioners have asserted that a bond would impose significant financial hardship upon them, Respondents have not disputed that claim, and the financial impact to Respondents of an improperly imposed injunction is limited and would not create any significant hardship, the Court will waive the security requirement. *See Pashby*, 709 F.3d at 331-32; *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999) (noting that "[i]n some circumstances, a nominal bond may suffice" and citing a case in which the bond was set at $0).

## CONCLUSION

For the foregoing reasons, Petitioners' Renewed Motion for a Preliminary Injunction, ECF No. 79, will be GRANTED. The injunction will be set forth in a separate order.

Date: May 7, 2020                             /s/ *Theodore D. Chuang*
                                              THEODORE D. CHUANG
                                              United States District Judge