**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| MAURICIO COREAS *et al.*, | |
| Petitioners, | |
| v. | Civil Action No. TDC-20-0780 |
| DONNA BOUNDS, *in her official capacity as Warden, Worcester County Detention Center, et al.* | |
| Respondents. | |
| | |
| ALPHA IBRAHIM BAH MANSARAY, | |
| Petitioner, | |
| v. | Civil Action No. TDC-20-1304 |
| JACK KAVANAGH *et al.*, | |
| Respondents. | |

**MEMORANDUM OPINION**

Petitioners Mauricio Coreas, Jose Quinteros Hernandez, Julio Navarro Martinez, Angel Guzman Cedillo, William Kemcha, and Wilson Ramos Reyes have filed a civil class action ("*Coreas*") in which they seek release from detention pursuant to a writ of habeas corpus of a class of all medically vulnerable detainees held in Maryland detention facilities under the authority of United States Immigration and Customs Enforcement ("ICE"), on the grounds that the COVID-19 pandemic has resulted in unconstitutional conditions of confinement at those facilities. This case has been consolidated with a Petition for a Writ of Habeas Corpus filed by Petitioner Alpha Ibrahim Bah Mansaray ("*Mansaray*"), who seeks his release from immigration detention on

similar grounds. Pending before the Court is Petitioners' Motion for Class Certification and Expedited Bail Hearings. The Motion is fully briefed, and the Court held a hearing on the Motion on September 2, 2020. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Relevant background facts and procedural history are set forth in this Court's memorandum opinions and memorandum order addressing earlier motions for preliminary injunctions filed by certain Petitioners. *See Coreas v. Bounds (Coreas I)*, __ F. Supp. 3d. __, 2020 WL 1663133, *1-5 (D. Md. Apr. 3, 2020); *Coreas v. Bounds (Coreas II)*, __ F. Supp. 3d. __, 2020 WL 2201850, *1 (D. Md. Apr. 30, 2020); *Coreas v. Bounds (Coreas III)*, __ F. Supp. 3d. __, 2020 WL 2292747, *1-3 (D. Md. May 7, 2020). The Court incorporates those opinions and orders into this opinion and sets forth below only those additional facts relevant to the resolution of the pending Motion.

## I.    Pre-Class Petition History

Petitioners Mauricio Coreas, then an ICE detainee held at the Howard County Detention Center ("HCDC") in Jessup, Maryland, and Angel Guzman Cedillo ("Guzman Cedillo"), then an ICE detainee held at the Worcester County Detention Center ("WCDC") in Snow Hill, Maryland, filed this suit on March 24, 2020 along with a Motion for a Preliminary Injunction seeking their immediate release from immigration detention. They argued that, given their respective medical vulnerabilities, their detention at HCDC and WCDC (collectively, "the Detention Facilities") during the COVID-19 pandemic violated their rights to substantive due process under the Fifth Amendment to the United States Constitution, both because ICE, HCDC, and WCDC officials had acted with deliberate indifference to their health and safety and because their detention constituted impermissible punishment of civil detainees not reasonably related to a legitimate government

2

purpose. The Court found significant deficiencies in the conditions of confinement and the Detention Facilities' efforts to mitigate the risk presented by COVID-19, including a lack of testing for COVID-19, a failure to implement systematic social distancing protocols, and a lack of any procedures to address the heightened risk to detainees with certain medical conditions. *Coreas I*, 2020 WL 1663133, at *11. Nevertheless, the Court denied without prejudice the Motion for a Preliminary Injunction based on the lack of evidence that the coronavirus was present in either HCDC or WCDC. *Id.* at *10-14. In so ruling, however, the Court noted that if evidence emerged as to one of the Detention Facilities that the coronavirus had entered the facility, or that Respondents were failing to test individuals with symptoms consistent with COVID-19, it would find that the continued detention of detainees in that facility with conditions that place them at high risk for death or severe illness from COVID-19 ("high-risk detainees"), such as Coreas and Guzman Cedillo, likely violated the Constitution. *Id.* at *13.

Subsequently, a nurse at HCDC tested positive for COVID-19, *Coreas II*, 2020 WL 2201850, at *1, and at least one immigration detainee at WCDC was identified as having symptoms of COVID-19 but was not tested for the coronavirus, *Coreas III*, 2020 WL 2292747, at *2. After filing an Amended Complaint adding as a Petitioner William Kemcha, a high-risk detainee at WCDC, Petitioners filed renewed Motions for Preliminary Injunctions as to all three Petitioners. Relying on its previous analysis, the Court issued preliminary injunctions ordering the release of Coreas, Guzman Cedillo, and Kemcha pending their immigration hearings. *Coreas II*, 2020 WL 2201850, at *3; *Coreas III*, 2020 WL 2292747, at *6.

On May 26, 2020, Mansaray filed his Petition for a Writ of Habeas Corpus seeking his release from HCDC on the grounds that HCDC's failure to adequately protect him, a high-risk detainee, from the threat of COVID-19 violated his constitutional rights.

3

## II.    The Class Petition

On May 29, 2020, Petitioners filed a Second Amended Class Action Petition for a Writ of Habeas Corpus ("the Class Petition") which added Quintero Hernandez, Navarro Martinez, and Ramos Reyes as Petitioners.  The Class Petition seeks certification of a class defined as "All persons who are or will in the future be held in ICE detention in Maryland who are age 50 or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19." Class Pet. ¶ 107, ECF No. 105.  It also requests certification of a "Howard County Subclass" defined as "All persons who are or will in the future be in ICE detention at the Howard County Detention Center who are age 50 or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19," *id.* ¶ 108, and a "Worcester County Subclass" defined as "All persons who are or will in the future be in ICE detention at the Worcester County Detention Center who are age 50 or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19," *id.* ¶ 109.  The pending Motion for Class Certification and Expedited Bail Hearings followed.  On July 1, 2020, while this Motion was being briefed, the Court consolidated *Coreas* and *Mansaray.*

Petitioners are all current or former ICE detainees at HCDC or WCDC.  They all assert that they are high-risk detainees in that they have certain risk factors that they believe place them at high risk for severe illness or death if they contract COVID-19.  Coreas, who was detained at HCDC before this Court ordered his release pending his immigration hearing pursuant to a preliminary injunction, suffers from diabetes.  Quintero Hernandez is currently detained at HCDC and is 56 years old.  Navarro Martinez, who was detained at HCDC before his release on May 26, 2020 after an immigration judge granted his application for relief from removal, suffers from

severe gastritis, chronic heart pain, and a possible undiagnosed heart condition. Mansaray, who is currently detained at HCDC, previously suffered from pneumonia and has hypertension.

Guzman Cedillo, who was detained at WCDC before this Court ordered his release pending his immigration hearing pursuant to a preliminary injunction, suffers from hypertension, prostate problems, and chronic pain. Kemcha, who was detained at WCDC before this Court ordered his release under the same circumstances, suffers from a compromised immune system, high blood pressure, and lymphedema. Ramos Reyes, who was detained at WCDC before he was released on June 5, 2020 after an immigration judge granted his application for relief from removal, suffers from hypertension and diabetes.

As in the original Petition, Petitioners argue in the Class Petition that, in light of their high-risk status and the allegedly deficient mitigation measures to address the COVID-19 pandemic, their continued detention is unconstitutional because Respondents have acted with deliberate indifference to their health and safety, and the conditions of confinement amount to impermissible punishment. They also argue that their detention under the present conditions, particularly the lack of special measures to protect high-risk detainees, constitutes a denial of reasonable accommodations of their disabilities, in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796 (2018). In particular, Petitioners focus on the close quarters in which they are housed in HCDC and WCDC, the lack of frequent sanitation and disinfecting, the frequent turnover in staff who may be carrying the coronavirus, the limited medical resources and facilities in both HCDC and WCDC, the limited guidance on, and capacity for, testing for COVID-19, and ICE's failure to release a large number of detainees to address overcrowding.

### III.    Independent Review

Since the Court's rulings on the Motions for Preliminary Injunctions in which the Court found significant deficiencies in the Detention Facilities' mitigation measures, Respondents have reported that they have taken additional mitigation measures at both HCDC and WCDC, including issuing masks to staff and detainees, requiring certain staff to use these masks and other personal protective equipment ("PPE") under certain circumstances, and increasing sanitation in the Detention Facilities.  They reported that at WCDC, ICE detainees are now all housed in single cells.

On July 17, 2020, with the agreement of the parties, the Court appointed Dr. Fred Rottnek, Professor and Director of Community Medicine at Saint Louis University and the former Medical Director and Lead Physician for the Corrections Medicine Division of the Saint Louis County Department of Health, as an independent expert charged with conducting a review of the Detention Facilities' policies and practices in response to the COVID-19 pandemic, as well as the existing conditions at both facilities.  To prepare his expert report, Dr. Rottnek reviewed records from HCDC and WCDC, in particular, each facility's process notes memorializing actions taken to address COVID-19, medical records for certain detainees, and relevant filings in this case.  He also conducted an in-person visit to WCDC on July 31, 2020 and a separate visit to HCDC on August 1, 2020, during which he inspected the Detention Facilities' medical clinics, medical isolation units, housing units, detainee common rooms, central booking, and other common spaces such as kitchens and recreation rooms. Dr. Rottnek also spoke with various ICE detainees, as well as certain pretrial detainees and sentenced inmates in state criminal cases (collectively, "state

6

detainees"), during his visits to both Detention Facilities.[1] As to standards of evaluation, he relied primarily on the Centers for Disease Control and Prevention ("CDC") Interim Guidance on the Management of Coronavirus Disease 201 (COVID-19) in Correctional Detention Facilities, as well as on several other resources discussing COVID-19 management in general and COVID-19 management in correctional facilities in particular.

A.     **Screening and Testing**

Based on his review, Dr. Rottnek has concluded that both Detention Facilities have adopted screening protocols consistent with CDC guidelines.  Staff and newly arriving detainees are verbally screened with questions about symptoms, receive temperature checks, use hand sanitizer, and at HCDC pass over a disinfecting floor mat.  At both facilities, visitors are limited to attorneys for detainees.  For new detainees, HCDC requires a negative test from the sending facility or will quarantine the individual upon arrival, and it will not accept detainees from a facility with positive cases.  Both facilities have adequate plans to quarantine new detainees.

Dr. Rottnek found that both Detention Facilities have put in place diagnostic testing protocols consistent with CDC guidelines to administer COVID-19 tests to any symptomatic detainees.  As discussed below, both Detention Facilities have also conducted multiple rounds of universal surveillance testing, but neither has yet developed a specific plan for regular surveillance testing going forward.  Although Dr. Rottnek was informed that there had been three rounds of

---

[1]   Although Petitioners have alleged that certain HCDC ICE detainees were improperly warned by Officer Rosa Savage that providing negative information to Dr. Rottnek could cause the ICE contract to end and the detainees to be transferred to distant facilities, Dr. Rottnek stated at the hearing that all the HCDC detainees that he requested to interview were made available, and there is no evidence that any of those detainees were the individuals allegedly warned by Savage, so the Court finds that even if such conduct occurred, it did not materially impact Dr. Rottnek's conclusions.

surveillance testing at WCDC as of July 31, 2020, there has been no reporting provided on the results of two of those rounds.

### B.    Medical Care

For any detainees who test positive for COVID-19, HCDC and WCDC have adopted similar 14-day isolation and quarantine policies that are consistent with CDC guidelines. At WCDC, detainees who test positive are quarantined in cells in the air conditioned medical unit, whose cells are solid doors rather than bars. At HCDC, detainees who test positive are isolated in a large dormitory unit set aside for that purpose. Neither facility has negative-pressure isolation rooms. The conditions in both the WCDC medical unit cells and the HCDC quarantine dormitory are comparable to conditions in other parts of the facilities, with appropriate access to showers, clean clothing, clean linens, and phone calls.

Although some detainees reported slow responses to medical requests, according to Dr. Rottnek, the medical staffing levels and medical facilities are adequate for the jail populations. While the Detention Facilities appear to be providing adequate medical care to detainees with medical conditions that place them at high risk for severe illness from COVID-19, neither facility has any specific protocols or procedures in place to provide special protection or accommodations to those detainees. Dr. Rottnek noted that the lack of air conditioning at WCDC could potentially exacerbate chronic conditions. He also identified some lapses in medical documentation at WCDC.

### C.    Social Distancing

As to social distancing measures, at the time of Dr. Rottnek's visit, both facilities continued to have occupancy rates under capacity, with HCDC housing approximately 175 total detainees out of a capacity of 474, and WCDC housing approximately 166 detainees out of a capacity of

8

500.  In light of this limited population, WCDC has been able to house the 25 ICE detainees in single cells except for those deemed to need a cellmate by mental health providers.  Although HCDC also reported single occupancy for ICE detainees other than as recommended by mental health providers, certain ICE detainees told Dr. Rottnek that double occupancy in the ICE unit is common.  Some ICE detainees are in dormitory rooms with multiple beds, but those beds were spaced more than six feet apart.  At the hearing, Dr. Rottnek noted that the ICE units in both Detention Facilities were more crowded than the other parts of those facilities, such that expanding the number of units designated for ICE detainees is possible and advisable.  Both Detention Facilities have dayrooms large enough to enable social distancing for detainees, but Dr. Rottnek observed that many detainees were not practicing such distancing, nor was such distancing consistently enforced by staff.  Similarly, although detainees had been provided with masks and are required to wear them when outside their cells, Dr. Rottnek observed that they wore them inconsistently, and the use of masks was not regularly enforced by staff.  Though detainees reported that masks had been exchanged only once a week, masks for both staff and detainees are now in adequate supply, and at least at WCDC, are replaced twice a week.  Both Detention Facilities had signage in both English and Spanish instructing detainees to socially distance and to wear masks, but that signage appeared to have been recently installed in preparation for Dr. Rottnek's visit.

As to detainee and staff interaction, Dr. Rottnek noted that at both Detention Facilities, officers work with either ICE detainees or state detainees during a shift and do not move between the populations, but staff assigned to ICE detainees for one shift may be assigned to state detainees for their next shift, and vice versa.  Medical staff work with both populations.

### D.    Hygiene

Overall, both Detention Facilities were clean and well-maintained.  At both, cells have their own sinks and toilets, which the detainees are responsible for cleaning themselves.  Detainees are also responsible for cleaning the common areas in their units.  Each morning, they are provided a mop, bucket, brushes, and CDC-approved disinfectant cleaning agent.  Detainees also have access to diluted bleach and paper towels for cleaning during the day.  Detainees at both Detention Facilities are given soap for free, and those at WCDC also have access to liquid soap dispensers and hand dryers.  Both Detention Facilities have installed hand sanitizer dispensers, with WCDC installing them in the vestibule of housing units, and HCDC installing them throughout the facility, including in the housing units.  Although both Detention Facilities have adequate amounts of cleaning supplies, detainees reported some inconsistency in receiving those supplies.

### E.    Conclusions

Based on his inspection, Dr. Rottnek ultimately concluded that both HCDC and WCDC had implemented numerous, positive measures to mitigate the risk of COVID-19, including those relating to the screening, quarantining and isolation, diagnostic testing, and medical care of those who may have COVID-19, and those relating to the provision of masks and cleaning supplies to ICE detainees.  He has stated that both Detention Facilities have administrators who are "tak[ing] the risk of COVID-19 seriously," and that they are at the "opposite end of the spectrum" from other detention facilities that he has inspected in his expert capacity that had "horrific" conditions reflecting a "disregard for the well-being" of detainees.  Rottnek Rep. at 2, ECF No. 165; Sept. 2, 2020 Hr'g. Tr. at 64, ECF No. 190.  Dr. Rottnek believes that each facility could do more to enforce social distancing, which remains the best line of defense against COVID-19, and to ensure consistency in providing detainees with cleaning supplies.  He noted in particular that HCDC

10

would benefit from thinning out the population of ICE detainees by moving some to other parts of the facility.   In addition, Dr. Rottnek has concluded that there is a "pressing need" for each Detention Facility to formally develop and document their COVID-19 protocols, as each facility instead currently has only a running log of its actions as documentation for its policies and practices. Rottnek Rep. at 2.  Ultimately, however, Dr. Rottnek has concluded that "[c]urrent efforts seem to working at current census, current staffing, and current testing protocols." *Id.* at 2.

As to high-risk detainees, Dr. Rottnek has stated that from a public health perspective, "there is no way short of release to protect the medically vulnerable from grave risk of imminent infection and death." Rottnek Rep. at 21.  He therefore encourages enforcement of CDC guidelines, reductions in the overall jail population to improve social distancing, and the release or relocation of medically vulnerable detainees to allow them to maintain social distancing. During the hearing, Dr. Rottnek clarified that although there is no way to guarantee the safety of medically vulnerable detainees, the risk to them can be mitigated if there is surveillance testing at the facility, they are provided with masks, they are afforded proper cleaning and hygiene, and they are relocated within the facility as necessary to allow them to maintain social distance and then specifically directed to socially distance from others. Sept. 2, 2020 Hr'g. Tr. at 49-50.

## IV.    COVID-19 Testing

Both before and since Dr. Rottnek's inspections of the Detention Facilities, Respondents have reported on and conducted COVID-19 tests of detainees and staff at HCDC and WCDC.  As of the week of August 5, 2020, HCDC had conducted six rounds of universal surveillance testing. On June 23 and 24, 2020, all HCDC ICE detainees, state detainees, and staff were tested.  All 27 ICE detainees at HCDC tested negative for COVID-19, but one of the 152 state detainees and one staff member tested positive.  The positive state detainee was isolated, and all state detainees in

11

the wards in which he had been housed, which are separate from the ICE detainees' housing units, were quarantined. The staff member was placed on isolation at home. The second round of testing, completed on June 30, 2020, again revealed that none of the 23 ICE detainees tested positive for COVID-19, nor did any of the 148 state detainees. In the third round of testing, conducted during the week of July 14, 2020, no ICE detainees tested positive, but one state detainee, and two staff members did. A fourth round of testing was conducted the following week, the week of July 21, 2020, with the results revealing that none of the 27 ICE detainees tested positive for COVID-19, one state detainee tested positive, and no staff members tested positive. A fifth round of testing during the week of July 29, 2020 returned only one positive test, for the same state detainee who had tested positive in the previous round. A sixth round of testing conducted during the week of August 5, 2020 returned no positive test results.

Separate from the universal surveillance testing, HCDC learned that three staff members tested positive in tests conducted through other means: one, a nurse who works at HCDC one day per week, tested positive on April 25, 2020, and a nurse and a correctional officer tested positive on or about May 27, 2020. Because the last two rounds of universal testing have returned no new infections, HCDC currently has no plans for another round of universal testing.

At WCDC, four staff members reported positive tests conducted through their medical providers in late May 2020: three officers tested positive on or about May 26, 2020, and fourth employee, an off-duty officer, tested positive on or about May 31, 2020. WCDC then conducted a round of universal testing during the week of June 1, 2020, which resulted in all 122 ICE detainees and state detainees testing negative for COVID-19, but six of the 99 staff members testing positive. All 10 staff who tested positive were removed from duty for 14 days and not permitted to return to work until after they had received two negative tests. Additional individual

WCDC staff or contractors reported positive tests on or about July 27, 2020, August 20, 2020, and August 24, 2020.

On August 24, 2020, a newly arrived ICE detainee self-reported that he had tested positive for COVID-19 three weeks before his arrival at WCDC. WCDC was unable to obtain documentation of those results. The detainee was asymptomatic, but based on his statements, he was quarantined and given twice-daily temperature and vital signs checks. WCDC also quarantined an inmate who had been transported to WCDC with the detainee. WCDC has stated that it now plans to isolate all new ICE detainees and state detainees in a single cell for seven days, administer a COVID-19 test, and not release the individual into the general population until a negative test result is received.

On or about September 1, 2020, WCDC conducted another round of universal surveillance testing. That testing revealed that all WCDC staff, inmates, and detainees, including the detainee who self-reported a positive test, were negative for COVID-19. WCDC then reported that a single officer tested positive on or about September 11, 2020, and on September 14, 2020 reported that another single officer had tested positive. These two officers were not permitted to return to work and will not do so until they receive two negative tests. Finally, on September 17, 2020, WCDC reported that in a third documented round of universal surveillance testing, all ICE detainees and state detainees tested negative, with the exception of one state detainee whose test was misplaced and will need to be retested. All staff tested negative with the exception of one officer with an inconclusive result who was retested and will be isolated at home until a negative result is received.

## DISCUSSION

Petitioners request (1) certification of a class action seeking the release of high-risk ICE detainees from the Detention Facilities; and (2) expedited bail reviews. The Court will address the two issues separately.

## I.  Class Certification

At the outset, the Court notes that, though Respondents assert that "class action suits brought in a habeas corpus action are 'ordinarily disfavored,'" Opp'n Mot. Class Cert. at 17, ECF No. 118 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010)), there is substantial precedent for pursuing habeas actions on a class basis. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1117 (9th Cir. 2010) ("[T]he Ninth Circuit has recognized that class actions may be brought pursuant to habeas corpus."); *Bonner v. Cir. Ct. of City of St. Louis*, 526 F.2d 1331, 1335 n.4 (8th Cir. 1975) ("Habeas case class actions are allowed in this circuit."); *Diaz v. Hott*, 297 F. Supp. 3d 618, 626-28 (E.D. Va. 2018) (certifying a class action brought through a habeas petition), *aff'd sub nom. Guzman Chavez v. Hott*, 940 F.3d 867 (4th Cir. 2019), *cert. granted sub nom. on separate question, Albence v. Chavez*, No. 19-897, 2020 WL 3146678 (U.S. June 15, 2020). Indeed, numerous federal courts across the nation have certified, provisionally or otherwise, class actions brought by immigration detainees through habeas petitions during the ongoing COVID-19 pandemic. *See, e.g., Gomes v. Acting Sec'y, U.S. Dep't of Homeland Sec.*, No. 20-453-LM, 2020 WL 2113642, at *2-4 (D.N.H. May 4, 2020); *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 38-39 (N.D. Cal. Apr. 29, 2020); *Savino v. Souza*, ___ F. Supp. 3d ___, 2020 WL 1703844, at *4, *8 (D. Mass. Apr. 8, 2020). The Court may therefore consider both the Class Petition and the Motion.

## A.    Legal Standard

A class action allows representative parties to prosecute not only their own claims, but also the claims of other individuals which present similar issues. *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006). The use of a class action is primarily justified on the grounds of efficiency, because it advances judicial economy to resolve common issues affecting all class members in a single action. *See id.* Because of the need to protect the rights of absent plaintiffs to assert different claims and of defendants to assert facts and defenses specific to individual class members, courts must, before certifying a class, conduct a "rigorous analysis" of whether a proposed class action meets the requirements of Federal Rule of Civil Procedure 23. *Id.* Courts have wide discretion to certify a class based on their familiarity with the issues and potential difficulties arising in class action litigation. *See, e.g.*, *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010).

A plaintiff has the burden to show that all of the necessary prerequisites for a class action have been met. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 458 (4th Cir. 2003). In order to be certified, a class must satisfy all four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). If the named plaintiff satisfies each of these requirements, the Court must still find that the proposed class action fits into one of the categories of class action under Rule 23(b) in order to certify the class. Where Petitioners invoke Rule 23(b)(2), they must establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Importantly, a decision on whether these prerequisites are satisfied is not a preliminary assessment of the underlying merits of the claim. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156,

15

178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." (quoting *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971))). Nevertheless, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*; *see EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (holding that the party seeking class certification "must present evidence that the putative class complies with Rule 23").

Finally, because Petitioners also seek certification of two subclasses, the Court will also assess whether these subclasses are certifiable. "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). Subclasses must independently satisfy each of the requirements set out in Rule 23(a) and (b). *See Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 368 (7th Cir. 2012) (holding that there is "no objection" to having multiple subclasses in one class action so long as each subclass "otherwise satisfies the requirements for certifying a class, so that each could be the plaintiff class in a separate class action"); *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981) (holding that subclasses must independently satisfy Rule 23's requirements).

## B.   Standing and Mootness

Before turning to the Rule 23 factors, the Court must first address whether Article III of the United States Constitution poses a barrier to Petitioners' proposed class. Article III limits the judicial power of the federal courts to actual "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. This clause has given rise to the separate, though related, doctrines of standing and

mootness. Under the doctrine of standing, plaintiffs must prove that they have "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Under the doctrine of mootness, "[w]hen a case or controversy ceases to exist, the litigation is moot, and the court's subject matter jurisdiction ceases to exist also." *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, 789 F.3d 475, 482 (4th Cir. 2015). Both of these requirements apply to representative plaintiffs in class actions. *See Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) ("The strictures of Article III standing are no less important in the context of class actions."); *see also United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018) ("Normally a class action would be moot if no named class representative with an unexpired claim remained at the time of class certification.").

Here, Respondents argue that all of Petitioners either lack standing or have had their claims rendered moot such that the Court cannot certify the proposed class. As to standing, they argue that Quinteros Hernandez lacks standing because "his only 'medical condition' is that he is 56 years old—this is not a risk factor." Opp'n Mot. Class Cert at 31. This argument confuses standing with the merits of Quinteros Hernandez's claim. Even assuming that being 56 years old does not formally place an individual at a high risk of death or serious illness from COVID-19, Quinteros Hernandez has still properly alleged an injury-in-fact based on his continued incarceration under allegedly unconstitutional conditions arising from a failure to address the threat posed by the COVID-19 pandemic. This injury is traceable to Respondents and would be redressed by an order from this Court granting release or ordered remedial action. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). He therefore has standing.

17

Respondents further argue that the remaining named Petitioners—Coreas, Guzman Cedillo, Kemcha, Navarro Martinez, and Ramos Reyes—have all had their claims rendered moot by their individual releases. Coreas, Guzman Cedillo, and Kemcha were all released pending their immigration hearings by orders of this Court issued in conjunction with the granting of preliminary injunctions. *See* Apr. 30, 2020 Prelim. Inj. ¶ 1, ECF No. 88; May 7, 2020 Ord. ¶ 2, ECF No. 94. They have therefore received only interim relief. "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (internal citation omitted); *see also Morris v. Hoffa*, 361 F.3d 177, 189 (3d Cir. 2004) ("[A] decision on a preliminary injunction is, in effect, only a prediction about the merits of the case." (quoting *United States v. Local 560, IBT*, 974 F.2d 315, 330 (3d Cir.1992))). Because the Court must revisit this relief on the merits and may revoke their releases, the claims of Coreas, Guzman Cedillo, and Kemcha remain live controversies and are not moot.

Navarro Martinez and Ramos Reyes, by contrast, were both granted relief from deportation and were released on May 26, 2020 from HCDC and on June 5, 2020 from WCDC, respectively. ICE has waived its right to appeal the decision regarding Ramos Reyes, but it is not clear whether ICE has also waived its right to appeal the decision regarding Navarro Martinez. In such circumstances, at least where there is no sign of collateral consequences, their claims are now moot. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (holding that claims of a prisoner are moot after release from incarceration or parole and in the absence of a "collateral consequence" of the conviction).

The Class Petition and the Motion may nevertheless proceed. First, there is at least one named Petitioner from each of HCDC and WCDC who has a live claim. As to HCDC, Coreas and

Quinteros Hernandez have live claims, as does Mansaray, who is currently incarcerated at HCDC and is a high-risk detainee based on his medical condition of hypertension. As to WCDC, Guzman Cedillo and Kemcha have live claims. Moreover, it is well-settled that under certain circumstances, individuals such as Navarro Martinez and Ramos Reyes can serve as class representatives for purposes of class certification even after their own claims have been rendered moot. In *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the United States Supreme Court confronted a class action challenge to the probable cause determination procedures implemented by a California county. *Id.* at 47, 49. The Court noted that the named plaintiffs' claims became moot before the class was certified by the district court but nevertheless held that where a claim is "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires," the mootness of a named plaintiff's claim before class certification does not moot the class action. *Id.* at 51-52 (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980)). "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *Id.* at 52.

Here, Petitioners' claims are inherently transitory because based on the nature of immigration proceedings, their detention can suddenly end before a court can rule on a class certification motion. Just days after joining this case as a named plaintiff, Ramos Reyes was released based on a favorable ruling by the immigration court. Kemcha, who joined this case on April 26, 2020, had been scheduled for removal on April 1, 2020 and was granted a reprieve only two days before, on March 30, 2020, when the airline canceled his flight due to concerns about COVID-19. In similar circumstances, courts have held that immigration detention is sufficiently inherently transitory for the exception to mootness to apply. For example, in *Nielsen v. Preap*,

19

139 S. Ct. 954 (2019), a plurality of the Supreme Court applied this principle to a class of immigration detainees that had "claim[ed] that they would be harmed by detention without a hearing pending a decision on their removal" and concluded that "the fact that a class 'was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction' when, as in these cases, the harms alleged are transitory enough to elude review." *Id.* at 963 (quoting *Cty. of Riverside*, 500 U.S. at 52) (plurality opinion). "Because this type of injury ends as soon as the decision on removal is made, it is transitory." *Id.* Similarly, the United States Court of Appeals for the District of Columbia Circuit applied this same exception to mootness in a class action brought by another group of immigration detainees, this time pregnant minors who entered the United States alone without lawful immigration status, because "[t]he claims at issue likely will, or at least might, end quickly," as there were several potential events that might result in the plaintiffs' release from custody. *J.D. v. Azar*, 925 F.3d 1291, 1299, 1311 (D.C. Cir. 2019) (per curiam); *see also Lyon v. U.S. Immigration & Customs Enf't*, 300 F.R.D. 628, 639 (N.D. Cal. 2014) (holding that immigration detainees' class claims were inherently transitory because "the length of detention cannot be ascertained at the outset and may be ended before class certification by various circumstances"), *modified sub nom. Lyon v. U.S. Immigration & Customs Enf't*, 308 F.R.D. 203 (N.D. Cal. 2015).

The Court therefore finds that claims such as those of Navarro Martinez and Ramos Reyes are inherently transitory such that the Motion for Class Certification could "relate[] back to the filing of the complaint." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 n.2 (2013) (citing *Cty. of Riverside*, 500 U.S. at 51-52). Where Navarro Martinez was released before the filing of the Class Petition, his claim cannot support the class claim as to HCDC under the relation back doctrine. But the doctrine may be applied to Ramos Reyes's claim, which was included in the

Class Petition before he was released, such that even if Guzman Cedillo and Kemcha were not proper named plaintiffs with live claims relating to WCDC, the class claim as to WCDC could proceed based on Ramos Reyes's now moot claim.

### C.    Rule 23(a)

#### 1.    Numerosity

To satisfy the numerosity requirement, the proposed class must be so numerous that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In assessing this prerequisite, "numbers alone are not controlling," and a district court should consider "all of the circumstances of the case." *Ballard v. Blue Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976). The burden is on the plaintiffs to show that other class members exist and that their joinder is impracticable. *See Wal-Mart Stores, Inc.*, 564 U.S. at 351; *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356-57 (3d Cir. 2013); *Poindexter v. Teubert*, 462 F.2d 1096, 1097 (4th Cir. 1972) (per curiam).

Here, at the time of the filing of the Class Petition, the overall class consisted of 29 members, which included 12 identified members of the HCDC Subclass and 17 identified members of the WCDC subclass. The United States Court of Appeals for the Fourth Circuit has upheld the certification of a class with as few as 18 members. *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). Although as a numerical matter the sizes of the subclasses are at the lower end of certified classes, the Court finds that under the circumstances of this case, numerosity is satisfied. Although the numbers have since declined to a total of 12 overall class members, the Court appropriately considers the number of putative class members at the time of the filing of the Class Petition. *Cf. Cty. of Riverside*, 500 U.S. at 51-52

21

(applying the "relation back" doctrine to a class action where the claims at issue were "inherently transitory").

First, both subclasses are defined to include any future high-risk ICE detainees at HCDC or WCDC. "[T]he fact that the class includes unknown, unnamed future members . . . weighs in favor of certification." *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000). In *Cypress*, for example, the Fourth Circuit held that although a class of 18 African American doctors in one region who had been denied staff membership at the local hospital on the basis of race was sufficiently large on its own to satisfy numerosity, the class would likely also satisfy numerosity because the class could also be understood to contain members who had not yet moved to the area but who would like to do so if the challenged discriminatory policy were struck down. *Cypress*, 375 F.2d at 651-52, 653 & n.9. In *J.D.*, the court rejected the argument that numerosity was not satisfied where in a given year there were only 18 unaccompanied minors seeking an abortion while in federal immigration custody in part because "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them.'" *J.D.*, 925 F.3d at 1322 (quoting 1 Rubenstein, *Newberg on Class Actions* § 3:15 (5th ed. 2011)). Although the number of putative class members has declined with the recent releases of several ICE detainees, Respondents have reported on at least one new ICE detainee received at WCDC who arrived on August 24, 2020 and reportedly had previously tested positive for COVID-19. With the number of ICE detainees and thus putative class members likely to fluctuate over time, Petitioners' assertion that the subclasses include future immigration detainees as the Detention Facilities supports a finding of numerosity.

Second, joinder is impractical because of the special characteristics of the class members. As immigration detainees who may lack legal status and could be removed from the United States

22

at any time, they are inherently "transient," lack sophistication, and do not always speak English

well. *See* Daud Decl. ¶¶ 7-8, Mot. Preliminary Injunction Ex. 74, ECF No. 79-6 (describing the

need for a translator for an immigration detainee); Benevente-Perez Med. Records at 3, Mot.

Prelim. Inj. Ex. 75, ECF No. 81 (describing an immigration detainee's use of a translator). These

characteristics support a finding of numerosity. *See Brito v. Barr*, 395 F. Supp. 3d 135, 144 n.3

(D. Mass. 2019) (finding joinder impracticable for numerosity purposes in part because the class

of immigration detainees were "transient" and lacked English language skills and the ability to

secure counsel); *Mondragon v. Scott Farms, Inc.*, No. 17-356-FL, 2019 WL 6125928, at *4

(E.D.N.C. Nov. 18, 2019) (finding joinder of migrant worker class members impracticable for

purposes of numerosity based in part of their lack of English ability and their lack of

sophistication). Such detainees likely also have limited financial resources and lack the ability to

retain counsel to bring their own cases, which courts have also found to make joinder

impracticable. *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993) (finding numerosity

based in part on the fact that potential class members were "economically disadvantaged"); *Brito*,

395 F. Supp. 3d at 144 n.3 (relying in part on class members' lack of access to counsel); *Coleman*

*ex rel. Bunn v. Dist. of Columbia*, 306 F.R.D. 68, 80-82 (D.D.C. 2015) (finding joinder

impracticable in part based on class members' lack of financial resources); *Scott v. Clarke*, 61 F.

Supp. 3d 569, 584 (W.D. Va. 2014) (finding numerosity based in part on the class of prisoners'

lack of access to counsel to pursue challenges to allegedly inadequate medical care).

Third, the fact that both subclasses seek injunctive relief implicates another factor which

courts have held to support a finding of numerosity where the class is relatively small, as "the

defendant will not be prejudiced if the plaintiff proceeds on a class action basis, as opposed to an

individual basis, because the requested relief generally will benefit not only the claimant but all

23

other persons subject to the practice under attack." *Weiss v. York Hosp.*, 745 F.2d 786, 808 (3d Cir. 1984); *Penn. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). In *Jackson v. Danberg*, 240 F.R.D. 145 (D. Del. 2007), for example, the court held that a class of 16 current and all future death row inmates in Delaware was sufficiently numerous in part because "the numerosity requirement has been relaxed in cases like this where injunctive and declaratory relief is sought by the class." *Id.* at 147.

To be sure, as Respondents note, some factors make joinder appear less impracticable: the class members are geographically concentrated, they can be identified and served without much difficulty, and the efficiency gains of proceeding on a class basis are somewhat mitigated by the fact that Petitioners have requested individualized bail hearings for each class member. Even accepting these points in Respondents' favor, none of them are dispositive, and taken together they do not outweigh the factors detailed above demonstrating the impracticability of joinder. The Court therefore finds that numerosity is satisfied.

### 2.    Commonality

Commonality requires that a class have "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This prerequisite "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc.*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The claim arising from this shared injury must be sufficiently similar "that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350.

Here, Petitioners argue that, although the proposed class encompasses class members detained in multiple facilities, all of the putative class members have suffered the same injury—

24

"they have been or will be detained in Maryland with insufficient protection while at heightened risk of serious illness or death from COVID-19," Mot. Class Cert. at 8, ECF No. 116-1—and raise the same claim in response to that injury—that their continued detention violates their Fifth Amendment rights. Although the Class Petition refers at length to the conditions of confinement at the two Detention Facilities as the source of the constitutional violation, it also implicates at least one overarching policy imposed by ICE as one of the sources of the harm. Specifically, Petitioners allege that "ICE's official guidance on COVID-19 does not state under what conditions detainees would be tested" and "does not offer an effective way to determine who even has the virus." Class Pet. ¶¶ 50-51. Thus, Petitioners have identified a common question—whether ICE's policy of not requiring detention facilities to follow a testing protocol of some kind renders the conditions of confinement for ICE detainees in the Detention Facilities unconstitutional—that it is capable of classwide resolution and the determination of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The significance of this question is illustrated by Respondents' acknowledgment at the hearing on the Motion that any testing at the Detention Facilities is based on decisions and choices made by County authorities and not pursuant to any directives or mandates from ICE.

Courts have found that where class plaintiffs attack an overarching policy, the fact that the challenged policy is applied across multiple facilities does not defeat commonality. In *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), for example, the court upheld the certification of a class of prisoners that spanned 10 prisons in Arizona. *Id.* at 662. The court found that the proposed class satisfied the commonality requirement because the challenge was to "policies and practices of statewide and systemic application" relating to medical, dental, and mental health care, as well as confinement in isolation cells, by the Arizona Department of Corrections rather than conditions in

25

individual facilities. *Id.* at 662, 676. Where a single common question "will do" to meet this requirement, the Court finds that commonality has been established. *Wal-Mart Stores, Inc.*, 564 U.S. at 359.

Nevertheless, this case is most appropriately analyzed through the two subclasses proposed by Petitioners, consisting of the high-risk ICE detainees at HCDC and WCDC, respectively. Indeed, courts have found that a class action may comprise multiple subclasses even where no overarching certifiable class has been established. *See Shook v. Bd. of Cty. Comm'rs of El Paso*, 543 F.3d 597, 606-07 (10th Cir. 2008) (holding that where a district court had determined that there were too many variations in the mental health needs of inmates to allow for a single class alleging unconstitutional mental health treatment at a prison, the district court could have addressed this flaw by *sua sponte* authorizing subclasses that each complied with Rule 23's requirements); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1261-62 (11th Cir. 2004) (holding that where there were variations in state laws precluding a single class of doctors alleging breaches of contract by health maintenance organizations that systematically underpaid physicians for their services, subclasses could be certified covering class members applying the same legal standards), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

The subclasses are warranted because while Petitioners themselves focus on the on-the-ground conditions when they assert that "[a]ll of the proposed class members are being or will be subjected to the same conditions," Mot. Class Cert. at 8, the actual conditions at HCDC and WCDC appear to differ in certain ways. The two facilities differ on such issues as whether and how they accept new detainees, how crowded the facilities are as compared to their capacity limits, the number of detainees in a cell or dormitory, the facility's specific cleaning protocols, and to what extent COVID-19 has breached the facility. *Coreas I*, 2020 WL 1663133, at *4-5, 10-11; *Coreas*

26

*II*, 2020 WL 2201850, at *2; *Coreas III*, 2020 WL 2292747, at *3-4. Even though ICE may have a deficient overall policy relating to testing and other mitigation measures, the reality of how the Detention Facilities have filled that vacuum also differs, with WCDC relying on guidance from the Worcester County Health Department to determine when to conduct tests, and with HCDC relying on guidance from the Howard County Health Department as the basis for its decisions relating to testing and other mitigation procedures. Indeed, previously in this litigation, the Court has treated the Detention Facilities as each presenting different claims, noting that "the facts relating to the Detention Facilities are of particular importance to the Court's analysis." *Coreas I*, 2020 WL 1663133, at *10.

Despite these variations, the subclasses each satisfy commonality on their own. The subclasses each present as to the individual facility at issue the common question of whether the HCDC or WCDC policies and procedures relating to issues such as testing, screening, social distancing, sanitation, and treatment of high-risk detainees reveal deliberate indifference to detainee health and safety, and impose impermissible punishment, that renders the conditions of confinement unconstitutional as to high-risk ICE detainees. Resolution of whether the conditions at each facility are unconstitutional "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

Respondents' claim that the class members' entitlement to relief will turn on individual factors like the risk that each individual poses to public safety does not alter this conclusion. This argument misunderstands the nature of conditions-of-confinement constitutional claims, which are ordinarily assessed without regard to the criminal history of the individuals subjected to them. *See, e.g., Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (holding that "[p]risoners alleging that they have been subjected to unconstitutional conditions of confinement" must show "the

27

deprivation alleged [was], objectively, sufficiently serious" and "prison officials acted with a sufficiently culpable state of mind"). Several courts addressing similar claims have found the commonality requirement to be satisfied for classes of immigration detainees challenging the conditions of their shared facility in light of the risks of COVID-19 based on the common questions of whether the conditions involve "deliberate indifference" and a "substantial risk of serious harm." *See, e.g., Savino*, 2020 WL 1703844, at *7 (noting that variation among the detainees does not defeat commonality because "[a]t bottom, a common question of law and fact in this case is whether the government must modify the conditions of confinement—or, failing that, release a critical mass of Detainees—such that social distancing will be possible and all those held in the facility will not face a constitutionally violative "substantial risk of serious harm" (citations omitted)); *Zepeda Rivas*, 445 F. Supp. 3d at 38-39 (finding commonality based on the question whether detainees at a facility "are being exposed to an unreasonable risk of infection" from COVID-19 due to a lack of social distancing even though the relief could include releasing certain detainees by prioritizing those with serious health risks who are not a danger to the community). For these reasons, the commonality requirement is satisfied.

### 3.    Typicality

As for typicality, the class representative's claim and defenses must be "typical of the claims or defenses of the class" in that prosecution of the claim will "simultaneously tend to advance the interests of the absent class members." Fed. R. Civ. P. 23(a)(3); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). The named plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by" proof of the plaintiff's own individual claim. *Deiter*, 436 F.3d at 466-67. In analyzing this question, a court compares the class representative's claims and defenses to those of the absent class members,

considers the facts needed to prove the class representative's claims, and determines the extent to which those facts would also prove the claims of the absent class members. *Id.* at 467. The claims do not have to be factually or legally identical, but the class claims should be fairly encompassed by those of the named plaintiffs. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344 (4th Cir. 1998); *Parsons*, 754 F.3d at 685 (stating that claims are typical if they are "reasonably coextensive with the claims of absent class members and "need not be substantially identical" (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998))).

Here, the named Petitioners' claims are typical of the overall class and those of their respective subclasses because they allege the same claim and injury—a constitutional violation arising from an unreasonable risk to their health posed by the COVID-19 pandemic and Respondents' inadequate response to it—and seek the same relief on the basis of that injury, specifically, release from detention. The named Petitioners include individuals who are allegedly at high risk for serious illness from COVID-19 who are detained at, or subject to return to detention at, both Detention Facilities: Coreas, Quinteros Hernandez, and Mansaray at HCDC, and Guzman Cedillo, Kemcha, and Ramos Reyes at WCDC. The differences identified by Respondents are not material for purposes of typicality. Although Petitioners have varying medical conditions, and Respondents argue that Quintero Hernandez's age is not a high-risk condition, Petitioners' claims are not primarily based on their specific medical conditions; rather, they assert that the conditions of confinement at HCDC and WCDC are unconstitutional as applied to all high-risk detainees, regardless of the specific risk factors that make them vulnerable. Where all named Petitioners' claims center on establishing that Respondents have failed to respond adequately to the COVID-19 pandemic and have therefore subjected detainees to conditions of confinement that create an unreasonable risk to their health and safety, the efforts of any particular Petitioner to advance this

claim by proving such unconstitutional conditions will "simultaneously tend to advance the interests of the absent class members." *Deiter*, 436 F.3d at 466. This is equally true of the named Petitioners who are presently released pending their immigration hearings pursuant to the preliminary injunctions, as those Petitioners are similarly incentivized to establish the unconstitutionality of the conditions in order to convert their preliminary relief into permanent relief. Thus, where the class representatives claims need not be "identical," *Broussard*, 155 F.3d at 344, and need only be "reasonably coextensive" with those of absent class members, *Parsons*, 754 F.3d at 685, Petitioners have satisfied the typicality requirement.

### 4.   Adequacy

Finally, the named plaintiffs must "fairly and adequately protect the interests of the class" without a conflict of interest with the absent class members. Fed. R. Civ. P. 23(a)(4); *Ward*, 595 F.3d at 179-80. Even if there is a conflict of interest, it will not defeat the adequacy requirement when "all class members share common objectives[,] the same factual and legal positions, and . . . the same interest in establishing the liability of [defendants]." *Ward*, 595 F.3d at 180 (quoting *Gunnells*, 348 F.3d at 430). Here, Respondents do not assert that there is any conflict of interest between the named Petitioners and the rest of the class.

The adequacy prerequisite also requires consideration of "the competency of class counsel." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). Petitioners' attorneys have introduced evidence of their expertise and experience, and Respondents have not contested their competence. The Court therefore finds that the adequacy requirement is satisfied. *See Lloyd v. Gen. Motors Corp.*, 266 F.R.D. 98, 104 (D. Md. 2010) (finding that class counsel was adequate where "[c]lass counsel are highly experienced and have the intellectual and financial resources necessary to prosecute a sophisticated class action").

**D.      Rule 23(b)(2)**

If the named plaintiff satisfies each of the requirements under Rule 23(a), the Court must still find that the proposed class action fits into one of the categories of class actions under Rule 23(b) in order to certify the class. Petitioners seek to certify their proposed class under Rule 23(b)(2), which allows class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart Stores, Inc.*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*

Here, Petitioners have satisfied the first part of this provision in that Respondents' relevant action applies generally to all subclass members. In a comparable class action by inmates challenging the extreme temperatures in a Texas jail, the court held that "the same action/inaction by Defendants is the source of any injury for the entire General Class and the subclasses" because:

> All inmates, regardless of age or health, are subject to the *same* policy on climate control . . . all have the *same* heat-mitigation measures available to them . . . and all are (allegedly) harmed in essentially the *same* way—*i.e.*, by exposure to a substantial risk of serious harm because of exposure to excessive heat.

*Yates v. Collier*, 868 F.3d 354, 358, 368 (5th Cir. 2017). Likewise, Petitioners' class claims are based on Respondents' policies and actions or inactions in creating the conditions of confinement

31

at HCDC and WCDC during the COVID-19 pandemic, which Respondents have necessarily imposed on all class members, as well as HCDC Subclass members and WCDC subclass members, respectively.

Respondents challenge the second part of Rule 23(b)(2), arguing that injunctive relief is not "appropriate respecting the class as a whole," Fed. R. Civ. P. 23(b)(2), because "different subsets of putative class members may be entitled to relief where others would not" since it is not clear that all subclass members would be subject to release, the remedy necessarily sought in a habeas petition, through a single injunction. Opp'n Mot. Class Cert. at 24. Upon a finding that a class or subclass is subjected to unconstitutional policies or conditions of confinement, however, the Court could order certain global relief short of immediate release of all ICE detainees that would benefit all class members and thus satisfy Rule 23(b)(2), such as "an injunction ordering the government to reduce crowding of [d]etainees." *Savino*, 2020 WL 1703844, at *8; *see also Quadrelli v. Moniz*, No. 20-10685-ADB, 2020 WL 3051778, at *7 (D. Mass. June 8, 2020) (same); *Zepeda Rivas*, 445 F. Supp. 3d at 38 ("There is nothing about the procedural posture of this lawsuit—such as the fact that it seeks habeas relief or that it is on behalf of immigration detainees—that precludes provisional class certification."). Because there is available relief that would benefit the entire class or an entire subclass, Rule 23(b)(2) is satisfied. The Court will therefore grant the Motion as to class certification.

## II.    Expedited Bail Hearings

In light of what Petitioners contend are unconstitutional conditions of confinement, they ask this Court to hold expedited bail hearings for class members. Petitioners assert that such hearings are within this Court's inherent authority when entertaining a habeas petition, and that the use of such authority is warranted here because Petitioners have alleged a substantial

constitutional claim on which they have a high probability of success, and there are presently extraordinary circumstances justifying class members' immediate release. Respondents argue that this Court lacks statutory authority to release immigration detainees on bail, and that even if it has authority to conduct bail hearings, Petitioners have failed to demonstrate extraordinary circumstances warranting such action.

### A.    Legal Authority

The Court has already held that Petitioners may, through a habeas petition, seek their release on the grounds that their confinement under the present circumstances of the COVID-19 pandemic violates their constitutional rights. *Coreas I*, 2020 WL 1663133, at *6-7. Respondents nevertheless argue that this Court may not conduct bail reviews as part of its overall consideration of the habeas petition in the absence of explicit statutory authority to do so. It is firmly established, however, that federal courts have inherent authority to grant bail to habeas petitioners, even absent express statutory authority. *See, e.g., Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001); *Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986); *Baker v. Sard*, 420 F.2d 1342, 1343 (D.C. Cir. 1969) (holding that on a claim of illegal detention, "the court's jurisdiction to order release as a final disposition of the action includes an inherent power to grant relief pendente lite, to grant bail or release, pending determination of the merits"); *see also United States v. Eliely*, 276 F. App'x 270, 270 (4th Cir. 2008) (referencing the standard for release on bail of a prisoner pending a collateral attack on the conviction). In *Mapp*, the court applied this principle to immigration detainees and held that federal courts have the inherent authority to grant bail to habeas petitioners detained by the Immigration and Naturalization Service ("INS"), the predecessor agency to ICE, for violations of the Immigration and Nationality Act ("INA"). *Mapp*, 241 F.3d at 223 ("We hold that the federal courts have the same inherent authority to admit habeas petitions to bail in the immigration context

33

as they do in criminal habeas cases."). Where Respondents can identify no contrary authority other than a 100-year-old case refusing to grant bail to an immigration detainee charged with violating the now-obsolete Chinese Exclusion Act because that Act did not expressly authorize it, *Chin Wah v. Colwell*, 187 F. 592, 594 (9th Cir. 1911), the Court finds their position wholly unpersuasive.

Although *Mapp* acknowledges that a court's inherent authority to grant bail could be narrowed or removed by Congress, Respondents have identified no provision in the INA or elsewhere that has done so. While the INA contains a provision providing that the Attorney General's "discretionary judgment" regarding the application of 8 U.S.C. § 1226, which grants the Attorney General the authority to render decisions on the arrest, detention, and release of immigrants who may be subject to removal, "shall not be subject to review," 8 U.S.C. § 1226(e), this provision precludes only such exercises of discretion and does not bar constitutional challenges. *See Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (finding that § 1226(e) did not bar a constitutional challenge to the INA statutory scheme, because the extent of the Government's detention authority was not "a matter of discretionary judgment"). In discussing a related but distinct bar on judicial review in 8 U.S.C. § 1252(a)(2), the Supreme Court held that such limitations extend only to those decisions that Congress expressly identified in the statute as subject to the Attorney General's discretionary authority. *Kucana v. Holder*, 558 U.S. 233, 246–47 (2010). Notably, in *Mapp*, the court found that the Government had acknowledged that § 1226(e) did not preclude federal courts from exercising their inherent authority to release on bail habeas petitioners in immigration detention. *Mapp*, 241 F.3d at 228.

Although the Fourth Circuit has not directly ruled on whether federal courts have the inherent authority to grant bail in immigration habeas cases, it has, in holding that a district court

had the authority to review the constitutionality of a transfer of immigration detainees from one facility to another, relied on the general "presumption favoring judicial review" of administrative actions and the principle stated in *Kucana* that the INA's statutory bars to judicial review apply only to actions pursuant to "discretionary authority explicitly conferred in the statute." *Reyna v. Hott*, 921 F.3d 204, 209-10 (4th Cir. 2019) (citing *Kucana v. Holder*, 558 U.S. 233, 237, 246–47 (2010)). Where the Fourth Circuit generally presumes that it has the authority to review actions taken under the INA and views statutory bars to its review narrowly, the Court finds that Respondents' position that district courts are barred from rendering bail determinations in a habeas case absent explicit statutory authority in the INA is incompatible with these principles.

Thus, guided by *Mapp* and *Reyna*, this Court finds that it has the authority to engage in bail reviews for class members on the question of whether they should not be subjected to continued detention during the pendency of this case in light of likely unconstitutional conditions of confinement arising from the COVID-19 pandemic as applied to them. Such determinations are not reviews of the original discretionary bail determinations by the Attorney General under the INA but would instead consist of examining the conditions of the Detention Facilities, as applied to individual medical and other high-risk conditions, and assessing whether the present circumstances warrant bail pending a final determination on the constitutionality of detention.

As noted by Petitioners, federal courts have held that they may conduct bail reviews of individual ICE detainees who have filed habeas petitions alleging unconstitutional detention in light of the COVID-19 pandemic. *See, e.g., Zepeda Rivas,* 445 F .Supp. 3d at 41; *Savino v. Souza,* 2020 WL 1703844, at *8-9; *Yanes v. Martin,* ___ F. Supp. 3d ___, 2020 WL 3047515, at *5-6 (D.R.I. June 2, 2020); *see also Galan-Reyes v. Acoff,* ___ F. Supp. 3d ___, 2020 WL 2497133, at *2 (S.D. Ill. May 14, 2020) (in a constitutional challenge based on conditions of confinement

during the COVID-19 pandemic, rejecting the argument that review of an ICE detainee's habeas petition was precluded by § 1226(e) because the claim was a direct challenge to "Respondents' legal authority to continue his detention" and granting bail ); *Jeferson V. G. v. Decker*, No. CV 20-3644 (KM), 2020 WL 1873018, at *4, *9 (D.N.J. Apr. 15, 2020) (in a constitutional challenge based on conditions of confinement during the COVID-19 pandemic, rejecting the argument that the court was statutorily barred from granting bail by § 1226(e) and releasing the petitioner on bond). *But see Beltran v. Wolf*, ___ F. Supp.3d ___, 2020 WL 4187912, at *3 (N.D. Texas, July 20, 2020) (citing § 1226(e) to conclude that "to the extent that Petitioner asks the Court to either order his release to bond or review the immigration court's denial of bond, the Court lacks the authority to consider these requests").

Having concluded that this Court may entertain Petitioners' request for bail hearings, the Court turns to the standards for such release in the habeas context. In order to be released on bail pending resolution of a habeas petition, a petitioner must show (1) "substantial constitutional claims on which he has a high probability of success"; and (2) "exceptional circumstances making a grant of bail necessary for the habeas remedy to be effective." *United States v. Eliely*, 276 F. App'x 270, 270 (4th Cir. 2008) (citing *Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993), and *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974)); *see also Mapp*, 241 F.3d at 226 (holding that "a habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective" (citation omitted)).

### B.    High Probability of Success

Petitioners seek release from the Detention Facilities based on the claim that as high-risk detainees, they are presently subjected to unconstitutional conditions of confinement, in violation

of the Fifth and Fourteenth Amendments to the Constitution. This Court has previously construed the Petition as advancing two arguments: (1) that Respondents' efforts to address the risk of COVID-19 are so inadequate that they have failed to protect Petitioners from a known threat to their health and safety; and (2) that Petitioners' confinement during the COVID-19 pandemic amounts to impermissible punishment because they are civil detainees, not convicted and sentenced criminals. *See Coreas I*, 2020 WL 1663133, at *7-13.

As to the health and safety claim, the Court has previously found that the applicable standard is whether Respondents have acted with deliberate indifference to their health and safety. *See id.* at *8-9. Under this standard, Petitioners must show that, objectively, there is substantial risk that they will suffer a serious or significant physical or emotional injury "resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). "[A] condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" may violate the Constitution, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). They must also show that, subjectively, Respondents acted with deliberate indifference to such a serious medical need, which occurs when an official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he test is whether the guards know the [detainee] faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). If the requisite subjective knowledge is established, an official may avoid liability by responding

37

"reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

As to the impermissible punishment claim, civil detainees must show that either (1) the condition in question was imposed with the express intent to punish; or (2) it is not reasonably related to a legitimate, nonpunitive governmental objective, such that the intent to punish can be inferred. *Matherly v. Andrews*, 859 F.3d 264, 275 (4th Cir. 2017). As to the second prong, "due process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Id.*

In *Coreas I*, the Court found that the Detention Facilities had certain notable deficiencies in their response to COVID-19, including that there were no social distancing protocols; there was evidence of a lack of sufficient cleaning of common spaces and provision of cleaning supplies to detainees; there were no procedures to address the specific circumstances of high-risk detainees; and no steps had been taken to conduct testing for COVID-19. *See Coreas I*, 2020 WL 1663133, at *10-13. As a result, the Court concluded that if there were any cases of COVID-19 among detainees or staff, these identified deficiencies would support a likely finding of deliberate indifference on the part Respondents. *Id.* at *11. The Court also found that for high-risk detainees, since they are not charged with crimes but face only civil status violations, the presence of positive cases of COVID-19 in the Detention Facilities while "they are particularly vulnerable to COVID-19 because of the lack of ability to maintain distance from others" would likely render the conditions impermissibly punitive. *Id.* at *12.

Since those rulings, however, the conditions in the Detention Facilities have changed. Based on the observations and reporting by Dr. Rottnek, the Court finds that both Detention Facilities are generally clean and well-maintained, and they have adequate cleaning supplies, hand

sanitizer, and soap. As for social distancing measures, since *Coreas I*, the Detention Facilities have instituted a requirement that detainees wear masks in common areas, and they provide such masks on a regular basis. According to Dr. Rottnek, dayrooms are large enough to enable social distancing and have signage instructing detainees to maintain social distance from each other. As for cells, where both Detention Facilities remain below capacity and have fewer ICE detainees than in April 2020, WCDC now has ICE detainees in single cells except for those with mental health issues who should not be housed alone, and HCDC dormitory rooms have beds spaced more than six feet apart. Although Dr. Rottnek recommends greater enforcement of social distancing and designating additional housing units for ICE detainees to allow for even more distancing within common areas, the present conditions reflect specific improvement.

Another significant change is the record relating to testing. According to Dr. Rottnek, both Detention Facilities have procedures in place, consistent with CDC guidelines, to conduct diagnostic testing of any individuals with suspected COVID-19. Both HCDC and WCDC have also engaged in surveillance testing. HCDC has tested all detainees and staff on six different occasions between June and August 2020. Such testing resulted in four positive tests among state detainees, at least two of which related to the same individual, and no positive tests among ICE detainees. Between the surveillance testing and outside testing, there have been six positive tests among staff. At WCDC, there have been at least three full rounds of surveillance testing which have identified no positive cases among state detainees or ICE detainees. Between the surveillance testing and outside testing, there have been 15 staff members who have received positive tests, and one new ICE detainee reported that he tested positive before arriving. As to both Detention Facilities, the staff members who tested positive were quarantined at home and not allowed to return to work until they tested negative or were cleared by a doctor, the detainees with positive

tests were isolated, and, at least in some instances, members of their housing units were also quarantined. Although these results reflect that positive cases have existed among staff and state detainees at both Detention Facilities, there have been no cases of ICE detainees contracting COVID-19 at HCDC or WCDC. Thus, the positive tests among staff and state detainees have not catalyzed an outbreak or cases among ICE detainees, and the isolation and quarantine measures appear to be working satisfactorily. According to Dr. Rottnek, both the isolation and quarantine policies at both HCDC and WCDC are consistent with CDC guidelines.

Considering all of these measures, Dr. Rottnek has concluded that the administrators of the Detention Facilities are "tak[ing] the risk of COVID-19 seriously" and that "[c]urrent efforts seem to be working at current census, current staffing, and current testing protocols." Rottnek Report at 2.

There remain significant reasons for concern. As Dr. Rottnek has noted, enforcement of social distancing and mask usage remains inconsistent, and there is no formal plan for regular surveillance testing. Most importantly, there remain no specialized policies or procedures specifically designed to protect high-risk detainees, and Dr. Rottnek has stated, even with all of the measures in place, "there is no way short of release to protect the medically vulnerable." Rep. at 21. However, in light of the improvements to the mitigation measures at the Detention Facilities, the institution of surveillance testing, and the expert opinion that the Detention Facilities are taking the COVID-19 outbreak seriously, the Court does not find a substantial probability or likelihood that Respondents are presently acting with deliberate indifference to serious medical needs. Even under Petitioners' proposed, lesser standard based on *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), *see Coreas I*, 2020 WL 1663133, at *8, that would not include a subjective component, the Court reaches the same conclusion based on the combination of the low overall number of

detainees relative to facility capacity, the improved mitigation measures, the significant surveillance testing, and use of isolation procedures that have apparently prevented any infections among ICE detainees to date.

Likewise, although the information available as of *Coreas I* counseled that any positive cases would likely lead to an outbreak across a detention facility, the history to date suggests that with regular surveillance testing and the use of isolation and quarantine procedures, such an outbreak is not necessarily inevitable. This track record—reflecting that even with a small number of positive tests among staff and state detainees, no ICE detainee has tested positive in the over five months since Petitioners filed their claim despite the recently robust surveillance testing— necessitates a modified assessment of whether Petitioners are presently subjected to unconstitutional punishment. Moreover, where Dr. Rottnek has reported on new social distancing policies, has determined that the dayrooms are large enough to permit social distancing, and has identified the potential for more social distancing by moving ICE detainees within the Detention Facilities, the Court's prior conclusion that Petitioners were particularly vulnerable because of the "lack of ability to maintain distance from others," *Coreas I*, 2020 WL 1663133, at *12, must now be qualified. Accordingly, the Court does not find that there is presently a substantial probability that in the absence of cases among ICE detainees, the limited number of positive tests to date among staff and state detainees has imposed such a threat to high-risk detainees as to transform their confinement into impermissible, unconstitutional punishment. *Cf. Sys. Fed'n No. 91 Ry. Emp. Dept, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961) (noting, in a case involving a motion to modify a consent decree, that "the court cannot be required to disregard significant changes in law or facts"); *Zepeda Rivas v Jennings*, __ F. Supp. 3d. __, 2020 WL 3055449, at *4-5 (N.D. Cal. June 9, 2020) (in a constitutional challenge to immigration detention in light of COVID-19,

altering the terms of preliminary relief based on improvements to conditions of confinement for ICE detainees during the course of the litigation).

### .C. Exceptional Circumstances

Exceptional circumstances are those that "mak[e] a grant of bail necessary for the habeas remedy to be effective." *Eliely*, 276 F. App'x at 270. Exceptional circumstances may include "the raising of substantial claims upon which the [petitioner] has a high probability of success, a serious deterioration of health while incarcerated, and unusual delay in the appeal process." *Cf. Salerno v. United States*, 878 F. 2d 317, 317 (9th Cir. 1989) (discussing exceptional circumstances warranting bail pending appeal in an extradition case).

Based on the improved circumstances at HCDC and WCDC, as well as the fact that there is now a nearly six-month track record of no ICE detainees contracting COVID-19 at the Detention Facilities, the Court does not find exceptional circumstances warranting bail determinations for all high-risk ICE detainees at this time. While Petitioners and the putative class members all assert that they have conditions that place them at high risk of severe illness should they contract COVID-19, the fact remains that during their detention, that harm has not come to fruition. *See Lucas v. Hadden*, 790 F.2d 365, 367 (3rd Cir. 1986) (finding "extraordinary circumstances" warranting bail for a habeas petitioner who was "gravely ill" and was granted bail "on the condition that he enter a hospital to seek necessary medical care") (citing *Johnston v. Marsh*, 227 F.2d 528 (3rd Cir. 1955)). With the reduced numbers of ICE detainees in the Detention Facilities, improved mitigation measures, and test results showing no cases among ICE detainees and revealing that limited numbers of positive tests among staff or state detainees have not led to a surge in cases at either Detention Facility, the Court cannot presently find that exceptional circumstances require bail hearings as the only way to protect the health and safety of Petitioners. *See Daum v. Eckert*,

42

17-CV-239, 2020 WL 5040596, at *4 (E.D.N.Y. Aug. 26, 2020) (finding, where a habeas petitioner sought a bail hearing, no exceptional circumstances because petitioner "had ... not shown that the facility in which he is housed has failed to take appropriate steps to counteract the virus," where that facility had "implemented measures that are modeled on the CDC's guidance"); *Houston v. Davis*, No. 3:18-CV-03119-G, 2020 WL 3036616, at *2, n.5 (N.D. Tex. June 5, 2020) (finding no exceptional circumstances warranting a bail hearing where the petitioner made no allegation that anyone at his detention facility had contracted COVID-19 or that the facility had failed to take reasonable measures to prevent the spread of the disease); *cf. Carmen R. v. Decker*, No. 20-3875, 2020 WL 2029337, at *13 (D. N.J. Apr. 28, 2020) (finding no exceptional circumstances in part because the facility of detention had "implemented a variety of measures to combat the spread of the virus amongst detainees and staff"). Accordingly, the Court will deny the Motion as to bail hearings.

The Court notes, however, that this determination is not a permanent one. It is not lost on the Court that the vast majority of improvements in mitigation measures, and the entire surveillance testing effort, did not materialize until after the filing of this case and the Court's earlier rulings adverse to Respondents. Indeed, Dr. Rottnek found that many positive steps were implemented only in the days prior to his inspections. If Respondents do not maintain their newly adopted policies relating to masks and social distancing and continue to stock and distribute adequate supplies of cleaning materials and PPE, or if they fail to implement Dr. Rottnek's recommendations, particularly those relating to stronger enforcement of social distancing and mask policies, reallocating ICE detainees within the facilities to allow for greater social distancing both in cells and dayrooms, and adopting formal policies and procedures relating to COVID-19 mitigation, the Court's assessment of the conditions may have to be modified again. Most

importantly, where the Court has relied significantly on the fact and results of the surveillance testing performed to date, if the Detention Facilities fail to follow up with a regular surveillance testing program, the Court's evaluation of the bail review question would be subject to revision. Accordingly, the Court will deny the Motion as to bail reviews without prejudice.

## CONCLUSION

For the foregoing reasons, Petitioners' Motion for Class Certification and Expedited Bail Hearings will be GRANTED IN PART and DENIED IN PART. The Motion will be granted on the issue of class certification as to the overall class, the HCDC subclass, and the WCDC subclass. The Motion will be denied without prejudice on the issue of expedited bail hearings. A separate Order shall issue.

Date:  September 18, 2020

THEODORE D. CHUANG
United States District Judge