## UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

| | |
|---|---|
| MAURICIO COREAS *et al.*, | |
| Petitioners, | |
| v. | |
| DONNA BOUNDS, *in her official capacity as Warden, Worcester County Detention Center*, et al. | Civil Action No. TDC-20-0780 |
| Respondents. | |
| ALPHA IBRAHIM BAH MANSARAY, | |
| Petitioner, | |
| v. | Civil Action No. TDC-20-1304 |
| JACK KAVANAGH *et al.*, | |
| Respondents. | |

## MEMORANDUM OPINION

Petitioners in this civil class action seeking release from U.S. Immigration and Customs Enforcement ("ICE") detention pursuant to a writ of habeas corpus have filed a Second Emergency Motion for Expedited Bail Hearings ("the Second Bail Motion") in which they seek expedited bail hearings for members of the subclass consisting of ICE detainees at the Howard County Detention Center ("HCDC") in Jessup, Maryland who are age 50 or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19. To provide information relevant to the resolution of this Motion, and with the agreement of the parties, the Court directed an unannounced follow-up inspection of HCDC by Dr. Fred Rottnek, the parties'

agreed-upon expert, which occurred on January 2, 2021. Dr. Rottnek submitted a report on his inspection to the Court on January 11, 2021, and the parties submitted supplemental briefs on January 14, 2021 to address Dr. Rottnek's findings. Neither side requests a hearing on the Motion. Having reviewed the briefs and submitted materials, the Court finds no hearing necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be DENIED.

## BACKGROUND

### I.   Case History

Relevant background facts and procedural history are set forth in this Court's memorandum opinions and orders addressing earlier motions filed by certain Petitioners. *See Coreas v. Bounds* (*Coreas I*), 451 F. Supp. 3d. 407, 412–17 (D. Md. Apr. 3, 2020); *Coreas v. Bounds* (*Coreas II*), 457 F. Supp. 3d. 460, 461–62 (D. Md. Apr. 30, 2020); *Coreas v. Bounds* (*Coreas III*), 458 F. Supp. 3d. 352, 354–57 (D. Md. May 7, 2020); *Coreas v. Bounds* (*Coreas IV*), 2020 WL 5593338, *1–7 (D. Md. Sept. 18, 2020). The Court incorporates those opinions and orders herein and sets forth below only those additional facts relevant to the resolution of the pending Motion.

On March 24, 2020, the original Petition was filed, along with a Motion for a Preliminary Injunction ("the First Injunction Motion") seeking the original Petitioners' immediate release from ICE detention at either HCDC or the Worcester County Detention Center ("WCDC") in Snow Hill, Maryland based on alleged violations of their rights to substantive due process under the Fifth Amendment to the United States Constitution arising from the COVID-19 pandemic. At the time of that filing, HCDC had taken few steps to limit the spread of COVID-19. Few if any social distancing measures had been implemented, there was no systematic disinfecting of the facility, and no COVID-19 testing had been performed or even planned. *See Coreas I*, 451 F. Supp. 3d at 415. By April 2020, however, HCDC had begun screening all individuals entering the facility,

had ended all non-attorney visits, and had stopped receiving new ICE detainees. *Id.* at 424. Where HCDC was under capacity, housing 38 ICE detainees in a space that normally would accommodate 100 detainees, and there were no actual cases of COVID-19 at HCDC, the Court denied the First Injunction Motion but noted that the onset of cases of COVID-19 or a failure to institute a testing regimen could lead to a different result. *Id.* at 428. Thus, after a positive test at HCDC on April 23, 2020, the Court granted Petitioners' Second Motion for a Preliminary Injunction ("the Second Injunction Motion") and released the named Petitioner residing at HCDC. *Coreas II*, 457 F. Supp. 3d. at 462, 464–65.

In May 2020, Petitioners filed a Motion for Class Certification and Expedited Bail Hearings ("the First Bail Motion") in which they reasserted their original arguments on the unconstitutionality of their continued detention and requested expedited bail hearings for class members. With the consent of the parties, the Court appointed Dr. Fred Rottnek, Professor and Director of Community Medicine at Saint Louis University and the former Medical Director and Lead Physician for the Corrections Medicine Division of the St. Louis County Department of Health, as an independent expert charged with reviewing the practices and conditions at HCDC and WCDC relating to COVID-19 and conducting inspections of those facilities. *See Coreas IV*, 2020 WL 5593338 at *3.

Following his August 1, 2020 visit to HCDC, Dr. Rottnek concluded that HCDC had implemented numerous, positive measures to mitigate the risk of COVID-19, including screening protocols and isolation and quarantine policies consistent with CDC guidelines; the provision of masks and cleaning supplies to detainees; and the adoption of social distancing policies. *Id.* at *3– 5. ICE detainees had beds spaced six feet apart and dayrooms large enough to enable social distancing. *Id.* at *18. At the same time, however, he noted that HCDC had inconsistent

3

enforcement of mask and social distancing policies and did not have any specific protocols in place to provide special protection for high-risk detainees. *Id.* at *5.

By the time of the inspection, HCDC had begun conducting tests for COVID-19. As of August 2020, it had conducted six rounds of universal surveillance testing—COVID-19 testing of all detainees and staff at HCDC—resulting in six positive tests for staff members and three positive tests for detainees, none of whom were ICE detainees. *Id.* at *6. Overall, Dr. Rottnek concluded that HCDC was "taking the risk of COVID-19 seriously" and that HCDC's "current efforts" were "working at current census, current staffing, and current testing" levels. *Id.* at *5. He recommended that HCDC adopt formal COVID-19 policies, rather than merely keep a running log of actions taken to respond to COVID-19; do more to enforce social distancing policies and to provide cleaning supplies consistently; and relocate some ICE detainees within the facility to increase social distancing among them. *Id.* at *5. While stating that high-risk detainees could not be kept completely safe while in detention, he stated that the risk to them could be mitigated through regular surveillance testing, the provision of masks, proper cleaning and hygiene, and relocating ICE detainees within the facility as necessary to ensure social distancing. *Id.*

Based on the improvements and conditions identified by Dr. Rottnek, including the implementation of universal surveillance testing; the cleaning, social distancing, and mask policies; the sufficient spacing in the ICE detainee unit to allow for social distancing; and the continuing lack of cases of COVID-19 among the ICE detainee population, the Court concluded that Petitioners had failed to establish a high probability of success on their claim and thus denied the First Bail Motion. *Id.* at *18–19. The Court nevertheless identified several issues of continuing concern: inconsistent enforcement of social distancing and mask policies, the lack of a formal

4

plan for regular surveillance testing, and the continued lack of specialized policies or procedures for high-risk detainees. *Id.* at \*19.

## II.     Additional Evidence

Based on the submissions of the parties on the Second Bail Motion, and the results of Dr. Rottnek's unannounced inspection on January 2, 2021, the Court finds the following additional facts relating to the conditions at HCDC since the Court's ruling on the First Bail Motion.

### A.     Testing and Vaccinations

Since the Court's ruling on the First Bail Motion, HCDC has continued to conduct periodic universal surveillance testing. In consultation with the Howard County Health Department, HCDC has generally conducted weekly universal testing of detainees and staff but has conducted such testing on a bi-weekly basis if it has had two consecutive rounds of tests with no positive results. Dr. Rottnek finds this schedule and the testing procedures to be satisfactory.

At the end of September 2020, a round of universal surveillance testing revealed no positive cases among detainees or staff. On October 8, 2020, an arrestee who had arrived at HCDC on October 7, 2020 began exhibiting symptoms of COVID-19, was placed in isolation, and remained in isolation in the F-3 unit after he tested positive, a unit that is separate from the main jail building, has its own air supply, and has assigned staff who do not work in other areas of the jail. On October 13, 2020, another inmate, who was still in the required quarantine after her October 9, 2020 arrival, began exhibiting COVID-19 symptoms and so was moved into similar isolation in the F-1 unit. Before she tested negative, HCDC took the precautions of reviewing with staff the proper use of personal protective equipment ("PPE"), suspending all group activities, and scheduling the bleaching and electrostatic cleaning of the F units. Around October 26, 2020, an HCDC staff member tested positive for COVID-19, prompting HCDC to review surveillance video to

5

determine that the staff member had worn proper PPE and to conduct contact tracing. In another round of universal testing on or about October 26, 2020, all detainees and staff tested negative.

On November 7, 2020, after an HCDC staff member who had worked in the ICE units tested positive for COVID-19, HCDC consulted surveillance video to confirm that she had worn PPE during her time on duty, placed the ICE units on a 14-day quarantine, and conducted another round of universal testing, which revealed only one positive test, for a criminal detainee who had been in arrival quarantine and had had no contact with ICE detainees.

On November 12, 2020, a round of universal surveillance testing resulted in positive tests for one staff member, six criminal detainees, and one new ICE detainee still in arrival quarantine. All individuals who tested positive were placed in isolation, and the individuals in their housing units were quarantined. Another round of universal surveillance testing conducted during the week of November 16, 2020 had no positive results. Likewise, a round of universal surveillance testing during the week of November 23, 2020 had no positive results.

On December 7, 2020, an individual who had entered HCDC as a criminal detainee but had then been transferred into ICE detention in the West-6 housing unit began displaying symptoms of COVID-19. The detainee was placed in isolation, and ICE detainees in West-6 were placed in quarantine. In the Second Bail Motion filed on December 8, 2020, Petitioners asserted that HCDC staff told them that the individual had tested positive. According to HCDC, however, that detainee tested negative on December 1 and December 8.

On or about December 10, 2020, during universal surveillance testing, six detainees and four staff members tested positive for COVID-19, including one ICE detainee, who was not exhibiting symptoms and had been in quarantine in a receiving unit and thus had not been in contact with other ICE detainees. All individuals with positive tests were isolated. On or about

6

December 18, 2020, HCDC reported that another five criminal detainees had tested positive, but no ICE detainees tested positive. HCDC placed those criminal detainees in isolation and quarantined their housing units. On December 21, 2020, HCDC reported that during universal surveillance testing on December 16, another seven criminal detainees tested positive, but no ICE detainees tested positive. Those seven individuals were placed in isolation and their housing units were quarantined. HCDC reported that individual staff members tested positive on or about December 21, December 23, and December 28, 2020. On December 30, 2020, HCDC reported that six criminal detainees tested positive during universal surveillance testing on December 23.

On January 7, 2021, HCDC reported that in universal surveillance testing conducted on December 31, 2020, one criminal detainee and one staff member tested positive and were in isolation. In universal surveillance testing on January 12, 2021, there were no positive tests among detainees.

On January 12, 2021, HCDC reported that it had begun administering vaccines to HCDC detainees and staff. Of the 189 detainees, 40 received the first of two vaccinations during the week of January 3, 2021. Five of these individuals were ICE detainees, three of whom were class members. Of the 147 staff members, 80 received vaccinations. According to HCDC, all detainees, including ICE detainees, had approximately two weeks' notice, through messages on internal television screens and handouts, that vaccinations would be available, and they were able to sign up for a vaccination in advance or receive one on the day of administration without prior sign-up. Vaccinated detainees will receive the second dose in 28 days, and any detainee now wishing to receive the first dose may still request it.

7

**B.      New Procedures and Detainee Relocation**

Following Dr. Rottnek's August 2020 inspection, HCDC made several changes to its procedures and housing arrangements.  On September 21, 2020, HCDC issued Policy and Procedure # 1-823 ("the HCDC Policy"), formalizing many of its previously ad hoc COVID-19 practices relating to the screening of detainees, isolation and quarantining, COVID-19 testing, and the use of PPE and masks.  For example, the HCDC Policy requires screening new detainees for COVID-19 through temperature checks and questioning, isolating detainees exhibiting symptoms, quarantining all new detainees for 14 days regardless of symptoms, and testing new detainees on their fifth day in quarantine. The HCDC Policy mandates isolation for any detainee who has COVID-19 symptoms and requires all staff in contact with such a detainee to wear full PPE.  As to surveillance testing, the HCDC Policy provides that testing of all detainees will occur in accordance with the guidance of the Howard County Health Department and requires that any detainee testing positive for COVID-19 remain in quarantine until receiving two negative tests. The HCDC Policy also requires the issuance of cloth masks and surgical masks and the availability of soap, hand sanitizer, and cleaning supplies.  By the time of the second inspection, however, this policy document was again out of date in certain ways, such that it lacked an accurate statement of the current policy on providing N-95 masks.

According to HCDC Director Jack Kavanaugh, all detainees also now undergo daily, recorded temperature checks, and any who present symptoms consistent with COVID-19 or who test positive are placed in an isolation unit.  When staff members test positive for COVID-19, video surveillance is reviewed to determine whether that staff member was wearing proper PPE during contact with any detainees.

After a criminal detainee tested positive after a court appearance on or about November 17, 2020, HCDC instituted a procedure under which any detainees who left the facility for any reason would be placed on a minimum of a 10-day quarantine upon their return. Then, on November 20, 2020, HCDC decided not to accept any additional ICE detainees in light of a new ICE requirement that ICE detainees must be quarantined upon entry separately from criminal detainees.

In late November 2020, after HCDC was awarded $105,000 in grant funds, HCDC purchased a Vytis Shield Barrier Coating System, which aids in long-term infection prevention, and an ultra-violet light decontamination system portal, which staff members would have to walk through in order to enter the facility. HCDC also contracted with an outside company for disinfectant spraying throughout the facility.

On December 7, in the aftermath of the transfer of a criminal detainee to the ICE detention unit in West-6 who then developed COVID-19 symptoms, Kavanaugh decided to divide and relocate the ICE detainees. The seven most high-risk ICE detainees were moved to F-2, a unit with single cells, and the remaining eight were moved to West-4, a dormitory with space for 34 detainees, and given bunks spaced six feet apart. Dr. Rottnek confirmed during his second inspection that the ICE detainees in F-2 have single cells. Dr. Rottnek has concluded that although the dayroom in F-2 is smaller than the common space in West-6, with fewer detainees, "social distancing seems possible and was practiced." Rottnek Rep. at 13, ECF No. 298. Both units were reasonably clean, but ICE detainees reported to Dr. Rottnek that the toilets back up into the toilets in other cells.

When this move occurred on December 8, three ICE detainees—Alpha Ibrahim Bah Mansaray, Kabil Are, and another individual—remained in West-6 as criminal detainees were

moved into that unit.   According to HCDC, these detainees remained because they refused to move until December 10, when they were fully apprised of the move plan.

Overall, at the present time, HCDC has 200 detainees, less than half its capacity of 476. Almost all detainees are in single cells, with the exception of some who are in double cells because of potential suicide risks.

### C.    Hygiene and Social Distancing

According to Kavanaugh, HCDC is well-stocked with cleaning supplies, which are distributed regularly, and common areas are disinfected after every meal and at the end of every shift. Detainees may, but generally have not, submitted requests for or complaints about cleaning supplies.  During his second inspection, Dr. Rottnek observed a clean intake area, with hand sanitizer and cleaning supplies available, as well as housing units with cleaning supplies.  The ICE detainee units were generally clean, but the isolation unit was "messy, smelly," had uneaten food left on the floor of the common area, and its toilet and shower area was "dirty."  Rottnek Rep. at 19.   Dr. Rottnek was told that when more detainees are in quarantine, there are fewer detainees available to conduct cleaning.  Overall, other than the backed-up toilets in F-2, Dr. Rottnek found the sanitation measures adequate.

HCDC has directed all correctional officers to enforce the wearing of masks and social distancing and to report non-compliance, with a section relating to non-compliance now added to daily shift reports.  Specifically, detainees are required to remain six feet apart and to wear masks, which are distributed every two weeks and replaced more frequently if damaged.  Kavanaugh asserts that he conducts spot checks on mask compliance by reviewing video footage and that ICE detainees  largely adhere to the mask policy, with all infraction notices to date issued to criminal detainees. As for correctional staff, they are required to wear gloves, masks, and goggles or face

shields, with staff in medical or isolation units required to wear full PPE. As of December 14, 2020, following positive tests, Kavanaugh ordered that N-95 masks, previously provided only to detainees in isolation, be distributed to all detainees. The detainees thus have both cloth or surgical masks and N-95 masks, and they are required to wear the N-95 masks whenever there are positive tests in the universal surveillance testing and must do so until the next round of testing.

Though Dr. Rottnek observed that masks are readily available at this time, his interviews of detainees reflect that detainees receive no more than one N-95 mask per week. Dr. Rottnek also observed that proper mask wearing remains inconsistent among staff and detainees. In particular, Dr. Rottnek observed that many staff in the kitchen area did not wear masks correctly, with their noses exposed.

Petitioners assert that since Dr. Rottnek's first inspection, HCDC has curtailed the enforcement of hygiene and social distancing measures. According to Petitioner Mansaray, HCDC stopped providing soap in August 2020, such that he has had to buy it at the commissary, more recently stopped providing adequate cleaning supplies, and provides new masks only every three weeks. Although HCDC counters that a search of Mansaray's cell uncovered that he had multiple bars of soap, that finding is consistent with Mansaray's claim that he had to buy soap.

From interviews during his second inspection, Dr. Rottnek learned that around the time of the filing of the Second Bail Motion, cleaning at HCDC improved from cleaning every third or fourth day to every day, and that the provision of soap lapsed for some time between the inspections. Likewise, certain detainees reported that masks were previously hard to obtain, even though detainees now receive cloth, surgical, and N-95 masks.

Petitioners also contend that HCDC has not curtailed movement of staff between populations, and ICE detainees reported to Dr. Rottnek that staff wearing PPE have come into their

11

unit wearing PPE that they wore in other areas of HCDC, possibly in the nearby isolation and quarantine units. They also report that some detainees wearing PPE, presumably reflecting that they should be in isolation or quarantine, are allowed near other detainees in the medical unit.

### D.    Expert Conclusions

Dr. Rottnek continues to state, as he did after his first inspection, that 'there is no way short of release to protect the medically vulnerable from grave risk of imminent infection and death" because release is needed to allow them adequately to socially distance. Rottnek Rep. at 2. At the same time, Dr. Rottnek acknowledges that HCDC's screening, diagnostic testing, and surveillance testing practices are consistent with CDC guidelines and "seem to be working at this population," and that HCDC has taken "significant steps" since his first inspection on August 1, 2020 "to decrease the introduction and spread of coronavirus in the facility." *Id.* at 2, 13. These include maintaining a low census count of 200 detainees in a facility that can hold 476 detainees; maintaining adequate supplies of masks and cleaning supplies; conducting "robust" surveillance testing; making "appropriate use" of quarantine and isolation units; and arranging for the Vytis protective coating and UV entry portal. *Id.* at 2–3. He also deems the split of ICE detainees into two separate units to be "a positive change" that improves social distancing. *Id.* Despite the presence of positive tests, Dr. Rottnek acknowledges that "[s]ome infections are to be expected" in light of the test positivity rate in Howard County and notes that the lack of hospitalizations and deaths reflects that "the facility's procedures are working adequately." *Id.* at 3.

Going forward, Dr. Rottnek advises that HCDC take certain additional, corrective steps, including addressing toilet and plumbing issues; updating the written policies; enforcing policies on moving between units without changing PPE; improving cleaning, particularly in the isolation unit; enforcing more rigorously the wearing of masks by correctional officers; and posting

12

COVID-19 procedures and guidance. In his view, the "leadership in the facility understands and is taking significant efforts to mitigate introduction . . . of the virus within the facility," but there is "some disconnect with frontline officers" who do not always implement policies as intended, in part because of "COVID-19 prevention/precaution fatigue." Rottnek Rep. at 19. In its response to Dr. Rottnek's report, HCDC has now committed to resolve the issue with the toilets and to improve enforcement of procedures relating to the wearing of masks and PPE, to clean the isolation unit, and to more widely disseminate information about COVID-19 procedures and test results.

## DISCUSSION

In light of the recent number of positive tests at HCDC, Petitioners have renewed their Expedited Motion for Bail Hearings, asserting that, as detainees with high-risk conditions, their continued detention at HCDC subjects them to unconstitutional conditions of confinement necessitating their prompt release. This Court has previously construed the Petition as advancing two arguments: (1) that Respondents' efforts to address the risk of COVID-19 are so inadequate that they have failed to protect Petitioners from a known threat to their health and safety; and (2) that Petitioners' confinement during the COVID-19 pandemic amounts to impermissible punishment because they are civil detainees, not convicted and sentenced criminal prisoners. *See Coreas I*, 451 F. Supp. 3d. at 421–30.

## I.     Legal Standard

In order to be released on bail pending resolution of a habeas petition, a petitioner must show (1) "substantial constitutional claims on which he has a high probability of success"; and (2) "exceptional circumstances making a grant of bail necessary for the habeas remedy to be effective." *United States v. Eliely*, 276 F. App'x 270, 270 (4th Cir. 2008) (citing *Lee v. Jabe*, 989 F.2d 869, 871 (6th Cir. 1993), and *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974)); *see*

13

also *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001) (holding that "a habeas petitioner should be granted bail only in unusual cases, or when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective" (citation omitted)).

## II.     High Probability of Success

As to the health and safety claim, the Court has previously found that the applicable standard is whether Respondents have acted with deliberate indifference to Petitioners' health and safety. *Coreas I*, 451 F. Supp. 3d. at 421. Under this standard, Petitioners must show that, objectively, there is substantial risk that they will suffer a serious or significant physical or emotional injury "resulting from the prisoner's unwilling exposure to the challenged conditions." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993)). "[A] condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" may violate the Constitution, even if "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33–34 (1993); *Webb v. Deboo*, 423 F. App'x 299, 300 (4th Cir. 2011). They must also show that, subjectively, Respondents acted with deliberate indifference to such a serious medical need, which occurs when an official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[T]he test is whether the guards know the [detainee] faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)). If the requisite subjective knowledge is established, an official may avoid liability by responding "reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

14

Upon consideration of the present factual record, the Court does not find a high probability of success on the claim that Respondents have acted with deliberate indifference to the health and safety of Petitioners. Petitioners base their argument on the recent increase in positive cases, consisting of approximately 30 cases among detainees in November and December 2020, and what they see as continued failings on the part of HCDC, namely imperfect cleaning and availability of cleaning supplies; inconsistent enforcement of social distancing, mask, and PPE policies; and the lack of specific protocols relating to medically vulnerable detainees. During his inspection, Dr. Rottnek found evidence to support these concerns, including cleaning deficiencies in the isolation unit and backed-up toilets, detainees and staff not wearing masks properly, and allegations by detainees that soap and masks were not distributed widely until the Second Bail Motion was filed. In the Court's ruling on the First Bail Motion, however, the Court did not find a high probability of success on the merits even though at that time there remained, as identified by Dr. Rottnek, several issues of continuing concern, including inconsistent enforcement of social distancing and mask policies, the lack of a formal plan for regular surveillance testing, and the continued lack of specialized policies or procedures for high-risk detainees. *Coreas IV*, 2020 WL 5593338 at *19. Significantly, while some of these conditions persist, as noted by Dr. Rottnek, HCDC has since taken "significant steps" to mitigate the introduction and spread of COVID-19, Rottnek Rep. at 2, 13, including some measures that specifically address the areas of concern identified in his first report. These measures include adopting formal COVID-19 policies and a more regular schedule for universal surveillance testing, which Dr. Rottnek characterized as "robust," *id.*; tracking mask compliance in written reporting and distributing N-95 masks to all detainees as of mid-December 2019; arranging for the Vytis protective coating and UV entry portal; and moving the most high-risk ICE detainees to their own separate unit with single cells. Most recently, HCDC took the

significant step of offering and providing vaccination to all detainees, including ICE detainees, who wanted to receive it. This last step is particularly meaningful where vaccination in Maryland remains limited to only certain high-priority categories of individuals.

Although Petitioners argue that many of these measures would not have occurred in the absence of this litigation generally and the Second Bail Motion specifically, and this position is bolstered by some of the detainee accounts given to Dr. Rottnek, the measures are also fairly viewed as a response to the rising number of positive tests. The widespread distribution of N-95 masks, the movement of high-risk ICE detainees to their own unit, and the initiation of vaccinations are all highly significant actions that rebut the claim of deliberate indifference because they constitute reasonable responses to the rising threat to health and safety. *See Farmer*, 511 U.S. at 844. Although reasonable responses need not be successful in order to avoid a finding of deliberate indifference, at this point these additional measures have coincided with a recent reduction in the number of overall positive cases—with only one detainee case as of December 31, 2020 and no positive tests among detainees as of January 12, 2021, after several rounds of testing with up to seven positive cases among detainees on each occasion. They also coincide with the continuing lack of any positive cases among ICE detainees housed in the ICE units (West-6, West-4, and F-2) from September 2020 to the present. Under these circumstances, the Court does not find a high probability of success on the argument that, since the Court's ruling on the First Bail Motion, Respondents have acted with deliberate indifference to Petitioners' health and safety.

As for the impermissible punishment claim, civil detainees must show that either (1) the condition in question was imposed with the express intent to punish; or (2) it is not reasonably related to a legitimate, nonpunitive governmental objective, such that the intent to punish can be inferred. *Matherly v. Andrews*, 859 F.3d 264, 275 (4th Cir. 2017). On the second prong, "due

process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Id.* In ruling on the First Bail Motion, the Court concluded that in light of HCDC's institution of regular universal surveillance testing and appropriate isolation and quarantine procedures, an institutional headcount and living arrangements that afforded ICE detainees the ability to be socially distant, and the presence of only a limited number of positive tests among state detainees and staff, there was not a high probability of success on the argument that the ICE detainees' confinement constituted a form of impermissible punishment. *Coreas IV*, 2020 WL 5593338 at *19.

Although the substantial increase in the number of positive cases in November and December 2020 tests that conclusion, the Court nevertheless continues to find that there is not high probability of success on this claim. First, the response to the growth in positive cases included measures designed to provide increased protection to detainees, particularly the ICE detainees, such as the provision of N-95 mask to all detainees and the separation of ICE detainees into two units, with one providing single cells to the most high-risk detainees, to provide greater social distancing and isolation. Whether because of these measures or otherwise, the result to date has been that there still have been no positive cases among ICE detainees housed in the dedicated ICE units. The only positive case of an ICE detainee was of a newly arrived detainee who tested positive while in quarantine and was thus identified before being sent to an ICE unit.

Second, although Petitioners argue with some force that the lack of positive cases within the ICE units is not a sustainable condition, the recent added measure of providing vaccinations to detainees who want them, including ICE detainees, is a highly significant new development that undermines the claim of impermissible punishment. The provision of vaccinations, particularly at a time when they have been made available in Maryland to only the highest priority categories, is

17

inconsistent with a finding of an intent to punish. *See Matherly*, 859 F.3d at 275. Further, even accepting the fact that vaccinations do not provide immediate or certain protection, and that a second dose is required several weeks into the future, the provision of vaccinations reflects that the risk to Petitioners is now diminishing, such that the Court does not conclude that there is high probability of success on the claim that their conditions of confinement constitute impermissible punishment.

## III.   Exceptional Circumstances

Exceptional circumstances are those that "mak[e] a grant of bail necessary for the habeas remedy to be effective." *Eliely*, 276 F. App'x at 270. Exceptional circumstances may include "the raising of substantial claims upon which the [petitioner] has a high probability of success, a serious deterioration of health while incarcerated, and unusual delay in the appeal process." *Cf. Salerno v. United States*, 878 F. 2d 317, 317 (9th Cir. 1989) (discussing exceptional circumstances warranting bail pending appeal in an extradition case).

Beyond arguing that there is now a high probability of success on the merits, Petitioners have not identified any specific exceptional circumstances warranting bail determinations for all high-risk ICE detainees at this time. Other than the general claim of having high-risk conditions, they have not claimed that any detainees are presently so ill that immediate release must be considered. *See Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986) (finding "extraordinary circumstances" warranting bail for a habeas petitioner who was "gravely ill" and was granted bail "on the condition that he enter a hospital to seek necessary medical care") (citing *Johnston v. Marsh*, 227 F.2d 528 (3rd Cir. 1955)). As was the case on First Bail Motion, COVID-19 has not actually made its way into the ICE detainee population. Where Petitioners have identified no glaring deficiencies in HCDC's COVID-19 protocols, the Court cannot presently find that exceptional circumstances require bail hearings as the only way to protect the health and safety of

Petitioners. *See Daum v. Eckert*, 17-CV-239, 2020 WL 5040596, at \*4 (E.D.N.Y. Aug. 26, 2020) (finding, where a habeas petitioner sought a bail hearing, no exceptional circumstances because petitioner "had ... not shown that the facility in which he is housed has failed to take appropriate steps to counteract the virus," where that facility had "implemented measures that are modeled on the CDC's guidance"); *cf. Carmen R. v. Decker*, No. 20-3875, 2020 WL 2029337, at \*13 (D.N.J. Apr. 28, 2020) (finding no exceptional circumstances in part because the facility of detention had "implemented a variety of measures to combat the spread of the virus amongst detainees and staff"). Accordingly, the Court will deny the Motion.

The Court again notes, however, that this determination is not a permanent one. Where several detainees reported to Dr. Rottnek that the provision of cleaning supplies and masks, as well as the enforcement of cleaning and social distancing policies, waned last fall and rebounded only with the additional scrutiny coinciding with the filing of the Second Bail Motion, there remains a real concern that HCDC will not maintain and improve on its mitigation measures as needed. Thus, the tool of unannounced inspections, which HCDC voluntarily committed to permit "at any time," Kavanaugh Decl. ¶ 31, ECF No. 257-1, may be needed again. In order to avoid revisitation of this determination, HCDC must follow through and complete vaccinations of all detainees who agree to have one; continue robust surveillance testing and quarantine and isolation procedures; maintain its overall headcount at the current reduced levels, its policy of not receiving new ICE detainees during the COVID-19 pandemic, and its dedicated unit with single cells for high-risk ICE detainees; and maintain and improve upon the enforcement of mask, social distancing, and cleaning policies.

## CONCLUSION

For the foregoing reasons, Petitioners' Renewed Motion for Expedited Bail Hearings will

be DENIED.  A separate Order shall issue.


Date:    January 25, 2021

                                            THEODORE D. CHUANG
                                            United States District Judge